**Slip Op. 04-91**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: HONORABLE RICHARD W. GOLDBERG, SENIOR JUDGE**

ROYAL THAI GOVERNMENT, ET AL.,

    Plaintiffs,

      v.

UNITED STATES,

    Defendant,

      and

UNITED STATES STEEL CORP.,

    Defendant-Intervenor.

**PUBLIC VERSION**

Consol. Court No. 02-00026

[Court sustains in part and remands in part.]

           Dated: July 27, 2004

<u>Willkie Farr & Gallagher LLP</u> (<u>Kenneth J. Pierce</u> and <u>Jaemin Lee</u>) for Plaintiffs the Royal Thai Government and Sahaviriya Steel Industries Public Company Limited.

<u>Peter D. Keisler</u>, Assistant Attorney General, <u>David M. Cohen</u>, Director, <u>Patricia M. McCarthy</u>, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (<u>Thomas B. Fatouros</u>); <u>James K. Lockett</u>, Of Counsel, Office of Chief Counsel for Import Administration, United States Department of Commerce, for Defendant United States.

<u>Skadden, Arps, Slate, Meagher & Flom LLP</u> (<u>John J. Mangan</u>) for Defendant-Intervenor United States Steel Corporation.

**OPINION**

**GOLDBERG, Senior Judge:** In this action, Plaintiffs the Royal Thai Government ("RTG") and Sahaviriya Steel Industries Public Company Limited ("SSI") (collectively "Plaintiffs") challenge the final

affirmative countervailing duty determination reached by the U.S.
Department of Commerce ("Commerce") in Certain Hot-Rolled Carbon
Steel Flat Products From Thailand, 66 Fed. Reg. 50410 (Oct. 3,
2001) ("Final Determination").  Defendant-Intervenor United
States Steel Corporation ("U.S. Steel") also challenges certain
aspects of the Final Determination.[1]  The period of investigation
covers January 1, 1999 through December 31, 1999.  Pursuant to
USCIT Rule 56.2, both Plaintiffs and Defendant-Intervenor move
for judgment on the agency record.

For the reasons that follow, the Court sustains in part and
reverses and remands in part the Final Determination.  The Court
has jurisdiction over this matter pursuant to 28 U.S.C. §
1581(c).

## I.  STANDARD OF REVIEW

The Court will sustain the Final Determination unless it is
"unsupported by substantial evidence on the record, or otherwise
not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).  To
determine whether Commerce's construction of the statutes is in
accordance with law, the Court looks to Chevron U.S.A., Inc. v.
Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).
The first step of the test set forth in Chevron requires the

---

[1] Defendant-Intervenors/Plaintiffs Bethlehem Steel
Corporation, LTV Steel Company, Inc., and National Steel
Corporation were dismissed from this action in an order entered
by the Court on July 7, 2004.

Court to determine "whether Congress has directly spoken to the precise question at issue."  Id. at 842.  It is only if the Court concludes that "Congress either had no intent on the matter, or that Congress's purpose and intent regarding the matter is ultimately unclear," that the Court will defer to Commerce's construction under step two of Chevron.  Timex V.I., Inc. v. United States, 157 F.3d 879, 881 (Fed. Cir. 1998).  If the statute is ambiguous, then the second step requires the Court to defer to the agency's interpretation so long as it is "a permissible construction of the statute."  Chevron, 467 U.S. at 842.  In addition, "[s]tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under Chevron."  Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382 (Fed. Cir. 2001) (interpreting United States v. Mead, 533 U.S. 218 (2001)).  Accordingly, the Court will not substitute "its own construction of a statutory provision for a reasonable interpretation made by [Commerce]."  IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992).

## II.  **DISCUSSION**

A.   **Commerce's Determination that SSI's Debt Restructuring Was Not De Facto Specific Is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

The Asian financial crisis struck Thailand by July 1997, resulting in an overall contraction of Thailand's economy and

severe depreciation of its currency, the baht.  See Issues and Decision Memorandum in the Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products from Thailand (Sept. 21, 2001) ("Issues and Decision Memo") at 16.  In an attempt to foster economic stability and protect against further bank failures, the RTG began to implement economic programs, including the Corporate Debt Restructuring Advisory Committee ("CDRAC"), which was established in June 1998 by the Bank of Thailand.  Id. at 16-17.  CDRAC established a voluntary framework for independent debt restructuring negotiations between private corporations and financial institutions.  Id.  This framework involved the Debtor-Creditor Agreement and the Inter-Creditor Agreement, which included: (1) the requirement that a debtor negotiate with all creditors at once; (2) the designation of an independent financial advisor to report on a debtor's financial condition; (3) the establishment of a time-bound process with consequences for any party that did not adhere to the procedures; and (4) the requirement that creditors reach a consensus on the debt restructuring.  Id. at 17.

In March 1999 CDRAC released a list of 351 companies ("351 list") it considered priority targets for debt restructuring; among those listed were SSI and its subsidiary, Prachuab Port Company ("PPC").  Id. at 17-18.  CDRAC subsequently released a second list in April 1999 containing 316 companies, and a third

list in the second half of 1999 naming an additional 1,027 companies for potential CDRAC participation. Id. The selection criteria used in creating these lists were: (1) debtors with sizeable credit outstanding; (2) debtors proposed by the Thai Bankers' Association, the Foreign Bankers' Association, the Association of Finance Companies, the Federation of Thai Industries, and the Board of Trade of Thailand; (3) debtors that expressed their intention to participate in the restructuring process; and (4) debt restructurings involving multiple creditors. Id.

However, SSI's debt restructuring did not take place under the CDRAC guidelines. Id. at 18. In fact, neither SSI nor PPC even signed a Debtor-Creditor Agreement. See Memorandum In Support Of The Determination Of The U.S. Department Of Commerce And In Opposition To National Steel Corp, et al.'s Rule 56.2 Motion For Judgment On The Agency Record at 13. Rather, SSI's debt restructuring occurred in accordance with its Credit Facilities Agreement between itself and its private creditors, accommodating all forms of SSI's debt: both short- and long-term debt, from both secured and unsecured lenders, in baht and foreign currency denominations, providing feasible repayment terms. Issues and Decision Memo at 17-18. U.S. Steel claims that SSI received a countervailable benefit by being placed on the 351 list, and that Commerce erred in finding that any benefit

conferred on SSI in Thailand's 1999 debt restructuring response to the Asian financial crisis was nonspecific and does not amount to a countervailable subsidy. <u>See</u> National Steel Corporation, et al.'s Memorandum of Law in Support of Judgment on the Agency Record Pursuant to Rule 56.2 ("U.S. Steel Br.") at 10-11.[2] The Court finds U.S. Steel's argument unpersuasive.

A subsidy is de facto specific if it meets any one of the four criteria set forth in 19 U.S.C. § 1677(5A)(D)(iii):

> (I)   The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
>
> (II)  An enterprise or industry is a predominant user of the subsidy.
>
> (III) An enterprise or industry receives a disproportionately large amount of the subsidy.
>
> (IV)  The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii). 19 C.F.R. § 351.502 requires a sequential analysis of the foregoing factors. If any one factor warrants a finding of specificity, no further analysis is required. 19 C.F.R. § 351.502(a).

---

[2] The record is not clear as to whether the banks restructuring SSI's loans were government-owned, private, or a combination of both. However, the Court finds this fact irrelevant because the specificity issue is dispositive.

### 1.   The Actual Recipients of the Subsidy Were Not Limited in Number.

"The specificity test [of 19 U.S.C. § 1677(5A)(D)(iii)] was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy."  Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Doc. No. 316, vol. 1, 103d Cong., 2d Sess. (1994) at 261.  Expert opinions analyzed by Commerce concluded that the financial crisis was a systematic meltdown of the entire Thai economy, resulting in a fifty percent rate of non-performing loans.  See Issues and Decision Memo at 21.  As a result, the companies named on the 351 list as priorities for debt restructuring represented a wide spectrum of companies and industries, containing [  ] distinct industries, as classified by their International Standard of Industrial Classification Code.  See Defendants' Memorandum in Opposition to Plaintiffs' Motion for Judgment on the Agency Record at 20; see also Memorandum for the File Through Barbara E. Tillman, Certain Hot-Rolled Carbon Steel Flat Products from Thailand: Analysis of the List of 351 Firms ("351 List Memo") at 2.  Further, only 32 of the 351 companies on the list are in the primary metal production sector.  See Issues and Decision Memo at 19.  Given the numerous and diverse industries represented on the 351 list, the Court finds that Commerce did not err in its

finding that the 351 list was not limited in number based on industry or enterprise.

### 2. Neither SSI Nor the Steel Industry Were Predominant Users of the Subsidy, and They Did Not Receive a Disproportionately Large Amount of the Subsidy.

In its brief, U.S. Steel addresses the third prong of 19 U.S.C. § 1677(5A)(D)(iii), disproportion of benefits, as a separate "level of benefits analysis" discussion. See U.S. Steel Br. at 11-18. However, the Court finds that this analysis falls within the predominant user and proportion of benefits prongs of 19 U.S.C. § 1677(5A)(D)(iii)(III)-(IV) and addresses it as such. U.S. Steel alleges that Commerce failed to analyze properly the benefits conferred by being placed on the 351 list. See id. at 16. However, the Federal Circuit has held that "[d]eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case." AK Steel v. United States, 192 F.3d 1367, 1385 (Fed. Cir. 1999). In AK Steel, the Court found that Commerce did not err in demonstrating that there was no disproportionality based on calculations of the relative percentage benefit rather than the absolute benefit conferred. See id.

In the case at hand, Commerce's evaluation of the amount of the debt restructuring identified for each company and industry on the 351 list concluded that SSI's debt was less than that of

some companies on the list, but not significantly greater than that of many others on the list.  See Issues and Decision Memo at 19-20.  With [      ] percent of the total debt on the 351 list, the primary metal industry did not represent an overwhelming or disproportionate amount of the overall debt restructuring when compared to other industries on the list.[3]  See id. at 20; see also 351 List Memo at 2.  Moreover, SSI's portion of the total debt on the 351 list was a mere [     ] percent, accounting for [            ] baht out of a total of [                    ] baht of debt on the 351 list.  See 351 List Memo at 2.  In addition, the 351 list names companies in over 34 different industries, thus lending further support to Commerce's finding that SSI and the steel industry were not the predominant or disproportionate users of the subsidy's benefit as an industry or enterprise.  See id.

> **3.   The Manner in which the RTG Exercised Discretion in Granting the Subsidy Does Not Indicate that SSI or the Steel Industry Were Favored Over Others**.

In accordance with 19 U.S.C. § 1677(5A)(D)(iii)(IV), the RTG exercised proper discretion in creating the 351 list, showing no favor to any particular enterprise or industry.  The RTG created the 351 list based on the four criteria mentioned above.  In its

---

[3] All figures are based solely on the companies and industries named on the 351 list, since U.S. Steel's allegation is limited to this list.  However, as added support for Commerce's determination and the Court's finding, the Court notes that SSI and the steel industry represent an even lower proportion of the total CDRAC-promoted debt for restructuring when all lists created during the period of investigation are considered.

analysis, Commerce found that these criteria were consistently applied.  See Issues and Decision Memo at 20.  Further, expert opinion found that the CDRAC process was not tailored to any specific industry group or sector, but rather, that the 351 list was comprised of large debtors with many creditors in an attempt to stabilize the Thai banking system.  Id. at 21.

Accordingly, Commerce's determination that SSI's debt restructuring was not de facto specific is sustained.

**B.    Commerce's Decision Not to Investigate U.S. Steel's Equity Infusion Allegations Is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

The Investment Promotion Act of 1977 ("IPA"), administered by the Thailand Board of Investment ("BOI"), is designed to provide investors with tax and duty exemptions and reductions. Id. at 3.  To receive IPA benefits, a company must apply to the BOI for a Certificate of Promotion, which specifies the goods to be produced, production and export expectations, and the benefits requested.  Id. at 4.  The BOI grants Certificates of Promotion at its own discretion after evaluating and approving companies. Id.  In addition, the BOI may actively promote projects in particular industry sectors, as it did in offering promotion privileges to the hot-rolled steel industry in Thailand.  Id.

Thailand had considered establishing a private domestic steel industry since the 1960s, but the lack of natural resources and limited domestic demand made the creation of such an industry

unviable.  Id.  By the late 1980s, however, developing market factors in Thailand (namely, increased domestic demand) made a flat-rolled steel industry feasible.  Id.  Thus, on August 2, 1988, the BOI formally announced its promotion of domestic steel sheet production and requested applications from investors interested in developing a steel facility in Thailand.  Id.

SSI applied and was selected.  Id.  The BOI then approved a package of benefits for SSI, including (1) cost reduction measures, such as exemptions in import duties and corporate taxes; (2) straight investment incentives, such as tax-free dividends and foreign remittance; and (3) protection from competition.  Memorandum for the File Through Barbara E. Tillman, Countervailing Duty Investigation of Certain Hot-Rolled Carbon Steel Flat Products from Thailand: New Subsidy Allegation ("New Subsidy Allegation Memo") at 2.  U.S. Steel claims that these promotion privileges, which the BOI allegedly used to induce private entities to invest in SSI from 1990 through 1994, constitute countervailable subsidies.  See U.S. Steel Br. at 3. Commerce, however, refused to initiate an investigation into U.S. Steel's equity infusion allegations.  See Issues and Decision Memo at 34.

Commerce's refusal to investigate the alleged equity infusions is proper for two reasons.  First, the allegations did not reasonably appear to be countervailable.  Second, they were

not discovered within a reasonable time prior to the completion of the investigation.  The Court will address each rationale in turn.

    1.    **The Allegations Did Not Reasonably Appear to Be Countervailable**.

"This Court has consistently held that Commerce must investigate only those allegations that reasonably appear to be countervailable . . . ."  <u>Bethlehem Steel Corp. v. United States</u>, 25 CIT 930, 932, 162 F. Supp. 2d 639, 642 (2001) (internal quotation omitted).  To meet this initiation standard, an equity infusion allegation must be "supported by information establishing a reasonable basis to believe or suspect that the firm received an equity infusion that provides a countervailable benefit[.]"  19 C.F.R. § 351.507(a)(7).  "[A] benefit exists to the extent that the investment decision is inconsistent with the usual investment practice of private investors . . . in the country in which the equity infusion is made."  <u>Id.</u> § 351.507(a)(1).

U.S. Steel claims that SSI was not equityworthy at the time of its founding and that it would not have received equity investment without government inducement of private investors.  <u>See</u> U.S. Steel Br. at 36.  Thus, according to U.S. Steel, any equity investment in SSI was inconsistent with the usual investment practice of private investors.  <u>See</u> <u>id.</u>  However, an objective examination of SSI's equityworthiness demonstrates that

SSI was indeed equityworthy at the time the equity infusions were made.  As a result, U.S. Steel's equity infusion allegations do not satisfy the initiation standard, and Commerce's refusal to initiate a formal countervailing duty investigation is supported by substantial evidence.

19 C.F.R. § 351.507(a)(4)(i) sets forth a list of factors Commerce may examine in making an equityworthiness determination, including objective analyses of the future financial prospects of a firm, market studies, and economic forecasts.  See 19 C.F.R. § 351.507(a)(4)(i)(A).  Moreover, in determining whether there appears to be a countervailable subsidy, "Commerce [has] sufficient latitude to weigh and analyze both negative evidence and positive evidence."  Allegheny Ludlum Corp. v. United States, 25 CIT 816, 824 (2001) (citing Am. Lamb Co. v. United States, 785 F.2d 994, 997 (Fed. Cir. 1986)).

U.S. Steel points to the fact that BOI incentives were initially offered for SSI, resulting in no investor response.  See U.S. Steel Br. at 38.  Only after the BOI increased the incentives it was offering did investors come forward.  See id.  According to U.S. Steel, this fact proves that SSI was not equityworthy at the time of its founding since SSI was not able to attract investors without increased incentives.  See id.

However, in conducting its equityworthiness analysis,

Commerce found as follows:

> Evidence on the record indicates that at the time of
> SSI's founding, economic conditions were right for the
> development of a Thai hot-rolled steel industry: the
> economy was growing rapidly and domestic demand for
> hot-rolled steel was increasing and was being met
> exclusively by imports. Indeed, the record shows that
> the BOI promoted a hot-rolled steel industry to meet
> this increasing domestic demand for hot-rolled steel
> products.

New Subsidy Allegation Memo at 5. This is precisely the type of

market data that Commerce is allowed to consider under 19 C.F.R.

§ 351.507(a)(4)(i)(A). Thus, in light of Commerce's findings

that the economy was growing rapidly and there was increasing

domestic demand for steel being met exclusively by imports, the

Court is satisfied that "from the perspective of a reasonable

private investor," SSI "showed an ability to generate a

reasonable rate of return within a reasonable period of time."

See 19 C.F.R. § 351.507(a)(4)(i).

Commerce is also allowed to examine current and past

indicators of the firm's financial health in making its

equityworthiness determination. Id. § 351.507(a)(4)(i)(B). U.S.

Steel directs the Court's attention to the fact that SSI had

annual operating losses from 1994 through 1999. See U.S. Steel

Br. at 37. However, as Commerce correctly found, any financial

data reflecting SSI's operations after 1994 is irrelevant to an

analysis of SSI's equityworthiness in 1990.  <u>See</u> New Subsidy
Allegation Memo at 4.

Because the Court finds that there is substantial evidence
on the record indicating that SSI was equityworthy at the time
the equity infusions were made, Commerce did not err in refusing
to initiate a formal investigation.

**2.    The Allegations Were Not Discovered Within a Reasonable
       Time Prior to the Completion of the Investigation.**

19 C.F.R. § 351.301(d)(4)(i)(A) states that new subsidy
allegations should be made at least forty days before the
scheduled date of the preliminary determination to ensure that
the agency has sufficient time to investigate the allegation.  19
C.F.R. § 351.301(d)(4)(i)(A); <u>see also</u> <u>Bethlehem Steel</u>, 25 CIT at
932, 162 F. Supp. 2d at 642.  Here, U.S. Steel's subsidy
allegation was not made until fourteen days before the scheduled
date of the <u>Preliminary Determination</u>, clearly violating 19
C.F.R. § 351.301(d)(4)(i)(A).  <u>See</u> Petitioners' April 6
Submission ("Subsequent Subsidy Allegation") at 1, Public Record
("P.R.") 64, Confidential Record ("C.R.") 18.

However, even where an allegation is untimely under 19
C.F.R. § 351.301(d)(4)(i)(A), a petitioner may "correct for its
lapse in diligence by presenting the issue to Commerce at a
reasonable time prior to the issuance of its final
determination."  <u>Bethlehem Steel Corp. v. United States</u>, 25 CIT
307, 313, 140 F. Supp. 2d 1354, 1361 (2001).  U.S. Steel

presented its equity infusion allegations to Commerce five months before the scheduled date for the Final Determination. See Final Determination, 66 Fed. Reg. at 50410; Subsequent Subsidy Allegation at 1.

In Bethlehem Steel, the Court held that Commerce erred in failing to investigate a "straightforward subsidy allegation" made eighteen days before the preliminary determination (in violation of 19 C.F.R. § 351.301(d)(4)(i)(A)), but four months prior to the scheduled final determination. Bethlehem Steel, 25 CIT at 309, 313, 140 F. Supp. 2d at 1358, 1361. However, the Court expressly "recognize[d] that when Commerce is faced with . . . extraordinarily complex subsidy allegations it may lack the resources or the time necessary to investigate the new allegations[.]" Id. at 313, 140 F. Supp. 2d at 1361 (internal quotation omitted). The present case implicates precisely that concern. Indeed, "equityworthiness investigations are governed by a higher initiation standard to compensate for their laborious and difficult nature." Allegheny Ludlum, 25 CIT at 828. Thus, although four months may have been sufficient time in Bethlehem Steel where a straightforward subsidy allegation was at issue, the five months Commerce had in this case was not sufficient time to investigate U.S. Steel's complex equity infusion allegations.

   **3.   Commerce Did Not Deny U.S. Steel's Basic Procedural
         Rights.**

U.S. Steel also argues that the Final Determination must be
remanded on procedural fairness grounds, since Commerce erred by
waiting until the Final Determination to notify the parties of
its decision not to initiate a formal investigation into the
equity infusion allegations.  U.S. Steel Br. at 41-42.  U.S.
Steel contends that Commerce should have issued an "initiation
memorandum" instead, detailing its reasons for refusing to
initiate an investigation.  Id. at 42.

   The Court is not persuaded by U.S. Steel's meager argument
on this point.  Indeed, U.S. Steel cites no authority to support
its contention.  Moreover, no statute or regulation requires
Commerce to issue initiation memoranda or to notify the parties
within a certain amount of time that it is refusing to initiate a
formal investigation.  Although U.S. Steel may have preferred to
be notified immediately of Commerce's refusal to investigate so
it could "tak[e] steps to correct any evidentiary
deficiencies[,]" U.S. Steel overlooks the fact that there should
not have been any "evidentiary deficiencies" to correct.  Id.  19
C.F.R. § 351.507(a)(7) explicitly requires a petitioner, in the
first instance, to support its equity infusion allegations with
"information establishing a reasonable basis to believe or
suspect that the firm received an equity infusion[.]"  19 C.F.R.
§ 351.507(a)(7).  Here, U.S. Steel failed to provide Commerce

with sufficient information to believe that SSI received a countervailable equity infusion, and Commerce did not deny U.S. Steel any procedural rights by waiting until the <u>Final Determination</u> to notify U.S. Steel that its allegations were insufficient.

Accordingly, Commerce's refusal to initiate a formal investigation into U.S. Steel's equity infusion allegations is sustained.

**C.     Commerce's Decision to Countervail the Entire IPA Section 36(1) Drawback Program Is Not Supported by Substantial Evidence and Is Not in Accordance with Law.**

IPA Section 36(1) exempts companies from paying duties on imports of raw and essential materials that are incorporated into goods for export.  Issues and Decision Memo at 8.  SSI received a duty exemption under Section 36(1) for its imports of steel slab, which is the only raw material used to manufacture hot-rolled steel coil subsequently exported by SSI.  Memorandum in Support of Motion for Judgment on the Agency Record Under Rule 56.2 Filed by Plaintiffs the Royal Thai Government and Sahaviriya Steel Industries Public Company Limited at 7.  Manufacturing the steel slab into hot-rolled coil consumes the slab and generates waste. <u>Id.</u>  Cognizant of this, the BOI approved a waste rate of [   ] percent for SSI.  <u>Id.</u>  Commerce, however, found this approved waste rate to be excessive by [          ] percentage points, and then decided to countervail the entire amount of the

exemption, rather than just the excessive amount of waste.  Id.

Plaintiffs contest Commerce's decision to countervail the IPA

Section 36(1) drawback program in its entirety, see id. at 9-12,

as well as Commerce's finding that Section 36(1) does not provide

for a normal allowance for waste.  See id. at 12-18.

19 C.F.R. § 351.519 governs the drawback of import charges

upon export.  The relevant portions are as follows:

> (a)(1)(i) *Remission or drawback of import charges*.
> In the case of the remission or drawback of import
> charges upon export, a benefit exists to the extent
> that the Secretary determines that the amount of the
> remission or drawback exceeds the amount of import
> charges on imported inputs that are consumed in the
> production of the exported product, making normal
> allowances for waste.

> (a)(3) *Amount of the benefit*–(i) *Remission or
> drawback of import charges*.  If the Secretary
> determines that the remission or drawback . . . of
> import charges confers a benefit under paragraph (a)(1)
> . . . of this section, the Secretary normally will
> consider the amount of the benefit to be the difference
> between the amount of import charges remitted or drawn
> back and the amount paid on imported inputs consumed in
> production for which remission or drawback was claimed.

> (a)(4) *Exception*.  Notwithstanding paragraph
> (a)(3) of this section, the Secretary will consider the
> entire amount of . . . remission or drawback to confer
> a benefit, unless the Secretary determines that:

> (i) The government in question has in place and
> applies a system or procedure to confirm which inputs
> are consumed in the production of the exported products
> and in what amounts, and the system or procedure is
> reasonable, effective for the purposes intended, and is
> based on generally accepted commercial practices in the
> country of export[.]

19 C.F.R. § 351.519(a)(1)(i), (a)(3)(i), (a)(4)(i).

Commerce determined that "the RTG does in fact have a system in place to monitor and track the consumption and/or re-export of goods imported under Section 36(1)[,]" as required by § 351.519(a)(4)(i).  Issues and Decision Memo at 26.  However, Commerce asserts that IPA Section 36(1) does not make a normal allowance for waste under § 351.519(a)(1)(i) for two reasons: (1) the BOI did not isolate and examine the amount of inputs consumed in the production of the exported products; and (2) the BOI did not consider whether any of the scrap was recoverable and saleable.  Id. at 28.  As a result, Commerce determined that the RTG's system for ascertaining which inputs are consumed in the exported product, and in what amounts, is not reasonable or effective for the purposes intended.  Id.  Consequently, consistent with § 351.519(a)(4), Commerce decided to countervail the entire amount of SSI's import duty exemptions under IPA Section 36(1).  Id.

The Court finds Commerce's logic to be circular.  The main thrust of § 351.519 is to allow Commerce to countervail only that portion of a duty exemption corresponding to an excessive allowance for waste, as long as the drawback program is otherwise reasonable.  However, under Commerce's interpretation of § 351.519, the entire duty exemption is countervailable whenever the exporting country's § 351.519(a)(4)(i) system allows for an excessive amount of waste (no matter how small), since such waste

necessarily makes the system unreasonable. The problem with this logic is that it renders § 351.519(a)(3)(i) meaningless, because there could never be a situation where only the excessive portion of the exemption would be countervailed.

It is a basic tenet of statutory construction that effect must be given to every clause and word of a statute. See Duncan v. Walker, 533 U.S. 167, 174 (2001); Len-Ron Mfg. Co. v. United States, 24 CIT 948, 964, 118 F. Supp. 2d 1266, 1281 (2000). Because Commerce's application of § 351.519(a)(4)(i) essentially reads § 351.519(a)(3)(i) out of the regulations, the Court finds that Commerce's reasoning is not in accordance with law. As a result, the Court cannot sustain Commerce's decision to countervail the entire Section 36(1) drawback program.[4]

The question remains, however, whether IPA Section 36(1) permits an excessive allowance for waste, since any such

---

[4] Moreover, Commerce's decision to countervail the entire drawback program is inconsistent with Commerce's prior interpretation of § 351.519. In Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products From India, 66 Fed. Reg. 49635 (Sept. 28, 2001), Commerce concluded that the government of India applied a reasonable and effective system to confirm which inputs were consumed in the production of the exported products and in what amounts, thereby satisfying § 351.519(a)(4)(i). See Issues and Decision Memorandum: Final Results of the Countervailing Duty Investigation: Certain Hot-Rolled Carbon Steel Flat Products from India at Cmt. 5. However, Commerce noted that India's system allowed for duty drawback on certain items that, although used in the production of the subject merchandise, were not consumed in the production process. Id. Significantly, Commerce found that only the excess duty drawback (i.e., the "over-rebate") – as opposed to the entire duty drawback program – was countervailable. Id.

excessive amount clearly is countervailable under §

351.519(a)(3)(i).  Commerce's determination that Section 36(1)

permits an excessive allowance for waste is largely based not on

the <u>quantity</u> of waste at issue, but rather on the <u>end use</u> to

which the waste is put.  <u>See</u> Issues and Decision Memo at 27.

Commerce reasons that because the waste was resold domestically

as scrap (and, by definition, waste is something that "a company

is unable to recover and use"), there was an excessive allowance

for waste.  <u>Id.</u> at 10; <u>see also</u> Defendants' Memorandum in

Opposition to Defendant-Intervenors' Motion for Judgment Upon the

Administrative Record at 19-21.

Commerce's argument is without merit.  Section 351.519 does

not draw a distinction between waste that can be resold as scrap

and waste that cannot be resold as scrap.  Rather, §

351.519(a)(1)(i) directs that "a benefit exists to the extent

that . . . the amount of . . . drawback exceeds the amount of

import charges on imported inputs that are consumed in the

production of the exported product, <u>making normal allowances for</u>

<u>waste</u>."  19 C.F.R. § 351.519(a)(1)(i) (emphasis added).  Under

the regulation, it does not matter what ultimately happens to the

waste, as long as there is a normal allowance for waste.

Record evidence shows that IPA Section 36(1) makes a normal

allowance for waste.  The RTG has specific procedures for

determining what constitutes waste,[5] and Commerce verified that

the BOI actually applied these procedures when it approved SSI's

waste rate under Section 36(1).[6]  See, e.g., RTG Verification

Report at 8-11, P.R. 117, C.R. 33; SSI Verification Report at 7-

10, P.R. 116, C.R. 32.  In determining SSI's approved waste rate,

BOI engineers visited SSI's mill to examine SSI's production

capacity, processes, and efficiencies.  See RTG Verification

Report at 8, P.R. 117, C.R. 33.  Moreover, as Commerce concedes,

the BOI requires SSI to provide yield information annually, and

BOI officials visit SSI's mill regularly to monitor SSI's

---

[5] BOI Announcement No. Por. 6/1997 defines "waste" as:

   3.1  raw materials prior to, during, or after the
        production process which are flawed, not
        conforming to standards or are not usable for
        the original purpose to which they were
        designed;

   3.2  leftovers of raw materials or by-products;

   3.3  products, or parts of products or things
        produced from raw materials which are flawed,
        not conforming to standards or are not usable
        for the original purpose to which they were
        designed.

Royal Thai Government's Supplemental Questionnaire Response at
Exhibit 4 (May 31, 2001), P.R. 87.

[6] The approved waste rate under Section 36(1) aligns closely
with that of the RTG Customs Service under the RTG's regular duty
drawback provision, see SSI Verification Report at Exhibit 24,
P.R. 116, C.R. 32, which has been ruled acceptable by both
Commerce and the Court.  See Allied Tube & Conduit Corp. v.
United States, 25 CIT 23, 29-30, 132 F. Supp. 2d 1087, 1093-94
(2001).

compliance with its IPA Section 36(1) conditions.  <u>See</u> Issues and Decision Memo at 9.

In light of the substantial steps taken by the RTG to ensure that IPA Section 36(1) makes a normal allowance for waste, Commerce erred in relying on two extraneous sources of information[7] to support its finding that the waste rate is excessive.  <u>See</u> <u>id.</u> at 9-10.  Rather, Commerce should have limited its review to whether, based on generally accepted commercial practices in Thailand, IPA Section 36(1) makes a normal allowance for waste.  <u>See</u> 19 C.F.R. § 351.519(a)(4)(i) (stating that the system to confirm which inputs are consumed in the production of the exported products must be "based on generally accepted commercial practices in the country of export").  Because the Court finds that Section 36(1) does make a normal allowance for waste, there is no excessive waste to be countervailed, and the benchmark issue raised by U.S. Steel is therefore moot.

### III.  <u>CONCLUSION</u>

For the aforementioned reasons, the Court finds Commerce's determination that any benefit conferred on SSI in the 1999 debt

---

[7] The extraneous sources on which Commerce relied are "an independent financial review" and "yield and waste information reported in the companion antidumping investigation."  Issues and Decision Memo at 9.  While these two sources show yield factors slightly below that approved for SSI by the BOI, Commerce failed to assess the reasonableness of these alternative waste rates. As a result, the Court finds Commerce's reliance on them to be misplaced.

restructuring was nonspecific to be supported by substantial evidence and otherwise in accordance with law.  In addition, Commerce's refusal to initiate a formal investigation into U.S. Steel's equity infusion allegations is supported by substantial evidence and otherwise in accordance with law.  However, Commerce's decision to countervail the entire IPA Section 36(1) drawback program is not supported by substantial evidence and is not in accordance with law.  Because of the Court's disposition of the drawback issue, Plaintiffs' challenge to Commerce's determination that SSI and PPC received a countervailable regional subsidy through the provision of electricity at less than adequate remuneration is moot.

Commerce determined the total estimated countervailable subsidy rate for SSI to be 2.38 percent ad valorem.  Final Determination, 66 Fed. Reg. at 50411.  The portion of the total rate corresponding to Commerce's decision to countervail the Section 36(1) drawback program is 0.58 percent ad valorem. Issues and Decision Memo at 10.  Thus, since the Court holds that the drawback program is not countervailable, the revised subsidy rate is 1.80 percent ad valorem.  However, the de minimis countervailing duty rate for Thailand is less than two percent because of Thailand's status as a developing country for purposes of United States countervailing duty law.  See 19 U.S.C. § 1671b(b)(4)(B); Developing and Least-Developed Country

Designations under the Countervailing Duty Law, 63 Fed. Reg. 29945, 29948 (June 2, 1998). Accordingly, the Court remands the drawback issue to Commerce with instructions to find that the total estimated net countervailing subsidy rate is de minimis. As a result, Commerce is instructed to find that no countervailable subsidies are being provided to the production or exportation of certain hot-rolled carbon steel flat products from Thailand.

A separate order will be issued accordingly.


/s/ Richard W. Goldberg
**Richard W. Goldberg**
**Senior Judge**

**Date:** **July 27, 2004**
**New York, New York**