# United States Court of Appeals for the Federal Circuit

05-1117, -1118


ROYAL THAI GOVERNMENT and
SAHAVIRIYA STEEL INDUSTRIES PUBLIC COMPANY LIMITED,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant,

and

UNITED STATES STEEL CORPORATION,

Defendant-Appellant.


Kenneth J. Pierce, Willkie Farr & Gallagher LLP, of Washington, DC, argued for plaintiffs-appellees. With him on the brief were Victor S. Mroczka and Robert E. DeFrancesco. Of counsel was Matthew R. Nicely.

Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant United States. On the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; and Thomas B. Fatouros, Trial Attorney. Of counsel on the brief was James K. Lockett, Senior Attorney, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC and Mykhaylo A. Gryzlov.

Jeffrey D. Gerrish, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, argued for defendant-appellant United States Steel Corporation. With him on the brief were John J. Mangan and Robert E. Lighthizer.

Appealed from: United States Court of International Trade

Senior Judge Richard W. Goldberg

# United States Court of Appeals for the Federal Circuit

05-1117, -1118

ROYAL THAI GOVERNMENT and
SAHAVIRIYA STEEL INDUSTRIES PUBLIC COMPANY LIMITED,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant,

and

UNITED STATES STEEL CORPORATION,

Defendant-Appellant.

_____

DECIDED: February 1, 2006
_____

Before CLEVENGER, GAJARSA, and PROST, <u>Circuit Judges</u>.

PROST, <u>Circuit Judge</u>.

United States Steel Corporation ("U.S. Steel") and the United States separately challenge different aspects of the United States Court of International Trade's decision in favor of the Royal Thai Government ("RTG") and Sahaviriya Steel Industries Public Company Limited ("SSI") that, on remand to the United States Department of Commerce ("Commerce"), resulted in a determination that no countervailable subsidies were provided to the production or exportation of certain hot-rolled carbon steel flat products from Thailand. <u>See</u> <u>Royal Thai Gov't v. United States</u>, 341 F. Supp. 2d 1315

(Ct. Int'l Trade 2004) ("Decision"); Royal Thai Gov't v. United States, No. 02-00026 (Ct. Int'l Trade July 27, 2004) ("Remand Order"); Royal Thai Gov't v. United States, No. 02-00026 (Ct. Int'l Trade Oct. 1, 2004) ("Final Judgment"). In particular, U.S. Steel challenges the Court of International Trade's holdings (1) affirming Commerce's determination that SSI's debt restructuring was not specific; (2) affirming Commerce's decision not to investigate U.S. Steel's allegation of equity infusions; and (3) reversing Commerce's decision to countervail the entire amount of import duty exemptions, also called drawbacks, provided to SSI. The United States only challenges the third holding of the Court of International Trade. We affirm the Court of International Trade on the first two holdings, but reverse on the third.

BACKGROUND

In 2000, Commerce initiated an investigation to assess whether countervailable subsidies were provided to the Thai steel industry. See Notice of Initiation of Countervailing Duty Investigations: Certain Hot-Rolled Carbon Steel Flat Products From Argentina, India, Indonesia, South Africa, and Thailand, 65 Fed. Reg. 77,580 (Dec. 12, 2000). Of the several Thai programs that Commerce investigated, one involved import duty exemptions administered by Thailand's Board of Investment (the "BOI"). Another involved debt restructuring. Commerce ultimately concluded that countervailable subsidies were being conferred on hot-rolled steel from Thailand and assigned a countervailing duty rate on SSI. See Notice of Preliminary Affirmative Countervailing Duty Determination and Alignment With Final Antidumping Duty Determinations: Certain Hot-Rolled Carbon Steel Flat Products From Thailand, 66 Fed. Reg. 20,251 (Apr. 20, 2001) ("Preliminary Determination"); Final Affirmative Countervailing Duty

Determination: Certain Hot-Rolled Carbon Steel Flat Products from Thailand, 66 Fed. Reg. 50410 (Oct. 3, 2001) ("Final Determination"); Issues and Decision Memorandum in the Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products from Thailand (Sept. 21, 2001) ("Decision Memorandum").

Two of Commerce's determinations supporting its conclusion are relevant to this appeal. First, Commerce determined that the entire amount of SSI's import duty exemptions were countervailable export subsidies. This determination was based on its finding that RTG did not have a system or procedure in place that was reasonable and effective for the purpose of confirming which inputs were consumed in the production of exported products and in what amounts those inputs were consumed. In particular, Commerce faulted RTG for not isolating and examining what was consumed in the production of the exported products and for not taking into account that some scrap metal generated in the production of hot-rolled steel is recoverable and saleable. Second, Commerce determined that RTG's debt restructuring program was not countervailable. This determination was based on its finding that the debt restructuring program was not specific to SSI. It cited the fact that numerous and diverse industries were invited to participate in the debt restructuring program, that SSI's debt was less than a number of other invited companies, and that SSI's debt was not significantly greater than many other invited companies. It also stated that the primary metal industry, of which SSI is a part, did not have a disproportionate or overwhelming amount of the overall debt.

Also relevant to this appeal, Commerce declined to investigate an allegation by U.S. Steel that a countervailable subsidy exists because RTG injected equity into SSI

when SSI was not equityworthy.  See Memorandum from the Team to the File Regarding New Subsidy Allegation, (Sept. 21, 2001) ("New Subsidy Allegation Memo"). Commerce concluded that there was no basis for investigating the allegation. Commerce reviewed the evidence submitted by U.S. Steel and found that it did not establish a reasonable basis to believe or suspect that the company was not equityworthy at the time of its founding.  To the contrary, Commerce found evidence indicating that at the time of SSI's founding economic conditions were right for the development of a Thai hot-rolled steel industry.  Commerce also noted that U.S. Steel's allegation was untimely.

In response to Commerce's determinations, both SSI and U.S. Steel filed complaints in the Court of International Trade.  U.S. Steel challenged Commerce's determination that the debt restructuring was not specific and therefore not countervailable.  U.S. Steel also challenged Commerce's refusal to initiate an investigation into the allegation of countervailable equity infusions.  Among other things, SSI challenged Commerce's determination to countervail the entire amount of the import duty exemptions.

The Court of International Trade found for SSI on all three of these disputed issues.  First, the court upheld Commerce's determination that the subsidy conferred on SSI was not specific.  The court found that the actual recipients of the subsidy were not limited in number, that neither SSI nor the steel industry were predominant users of the subsidy or received a disproportionately large amount of the subsidy, and that the manner in which RTG exercised discretion in granting the subsidy did not indicate that SSI or the steel industry was preferred.  Decision, 341 F. Supp. 2d at 1317-20.

Second, the Court of International Trade upheld Commerce's decision not to investigate U.S. Steel's allegation of countervailable equity infusions. The court ruled that the allegation did not reasonably appear to be countervailable because there is substantial evidence in the record indicating that SSI was in fact equityworthy at the time the equity infusions were made. It also ruled that, due to the complex nature of equityworthiness evaluations, the allegation was not discovered by Commerce within a reasonable time prior to the completion of the investigation. In addition, the court found that Commerce did not deny U.S. Steel's basic procedural rights by waiting until issuance of the Final Determination to notify U.S. Steel that its allegation was insufficient. Id. at 1320-23.

Third, the Court of International Trade overturned Commerce's decision to countervail the entire amount of the import duty exemptions provided to SSI, concluding that Commerce's decision was neither supported by substantial evidence nor in accordance with law. The court based its conclusion on Commerce's interpretation and application of 19 C.F.R. § 351.519, which governs drawback of import charges upon export. The court characterized Commerce's interpretation as requiring that the entire duty exemption be countervailed whenever the system allows for any excess amount of waste (no matter how small), because any excess waste necessarily makes the system unreasonable. According to the court, this interpretation would render meaningless the separate regulatory subsection allowing only the excess portion of the exemption to be countervailed. Furthermore, the court stated that § 351.519 does not draw a distinction between waste that can be resold as scrap and waste that cannot be resold as scrap, and that under the regulation it does not matter what ultimately happens to the waste,

so long as there is a normal allowance for waste. The court then reviewed the evidence and concluded that RTG's system does make a normal allowance for waste because it has specific procedures for determining what constitutes waste. In reviewing the evidence, the court faulted Commerce for relying on two "extraneous" sources of information to support its finding that RTG's waste rate is excessive. Those two sources of information were a parallel antidumping investigation and a financial audit. According to the court, Commerce should have limited its review to determining whether, based on generally accepted commercial practices in Thailand (as opposed to the United States presumably), RTG's system makes a normal allowance for waste. The court also found Commerce's reliance on the "extraneous" sources of information to be misplaced because Commerce did not assess the reasonableness of the waste rates identified in these sources. Id. at 1323-26.

Because countervailing only the excess, rather than the entire, import duty exemption resulted in a countervailing duty rate of less than two percent, and further because Thailand is considered a developing country for purposes of the United States countervailing duty law and therefore the threshold rate for Thailand is two percent, the Court of International Trade remanded the case to Commerce with instructions to find that the total estimated net countervailing subsidy rate is de minimis. Id. at 1326-27; Remand Order. Commerce issued a redetermination decision in accordance with the court's instructions, noting its disagreement and reserving its appeal rights. Final Results of Redetermination on Remand (Sept. 15, 2004). The Court of International Trade affirmed. Final Judgment.

We have jurisdiction to review the final judgment of the Court of International Trade pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

I

We exercise de novo review over a decision of the Court of International Trade affirming or reversing the final results of an administrative review. Torrington Co. v. United States, 82 F.3d 1039, 1044 (Fed. Cir. 1996). "That is, we 'apply anew' the court's statutorily-mandated standard of review to the administrative review." Id. (quoting PPG Indus., Inc. v. United States, 978 F.2d 1232, 1236 (Fed. Cir. 1992)). Thus, in this case we will uphold Commerce's determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000). While we essentially step into the shoes of the Court of International Trade and duplicate its review, Allegheny Ludlum Corp. v. United States, 287 F.3d 1365, 1370 (Fed. Cir. 2002), in doing so we do not altogether ignore its informed opinion, Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 983 (Fed. Cir. 1994). See also Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004).

II

This case presents three issues for us to resolve. We must decide, in light of the Court of International Trade's decision, whether (1) Commerce's determination that the debt restructuring was not specific is supported by substantial evidence and is otherwise in accordance with law; (2) Commerce's determination not to initiate an investigation in the allegation of equity infusion is supported by substantial evidence and

is otherwise in accordance with law; and (3) Commerce's determination to countervail the entire amount of the import duty exemptions is supported by substantial evidence and is otherwise in accordance with law.

### A. Commerce's Determination that the Debt Restructuring Was Not Specific

As the Court of International Trade recognized, to determine whether a subsidy is de facto specific, Commerce is required to analyze four factors set forth in 19 U.S.C. § 1677(5A)(D)(iii). That statutory provision states that a subsidy is specific if one or more of the following situations exists:

> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
> (II) An enterprise or industry is a predominant user of the subsidy.
> (III) An enterprise or industry receives a disproportionately large amount of the subsidy.
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii) (2000).

U.S. Steel does not separately take issue with Commerce's analysis of each of the four factors. Rather, U.S. Steel generally argues that Commerce erred by only reviewing the distribution of the magnitude of the loans that were restructured rather than the magnitude of the benefits conferred by the restructuring. U.S. Steel would require an analysis that includes two parts: first, for each company Commerce would compare the interest rate and repayment schedule of the loan before restructuring with the rate and schedule of the loan after restructuring to identify the benefit conferred by the restructuring; second, Commerce would compare the benefits between companies and industries to determine specificity.

RTG and SSI (hereinafter, collectively "RTG") as well as the United States contend that requiring Commerce to determine and compare benefits in this manner would result in unreasonably extensive investigations. They also argue that such a requirement would contradict this court's indication in AK Steel Corp. v. United States that Commerce should be given latitude in determining specificity:

> Determinations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case. . . . Because Commerce's methodology in determining disproportionality was reasonable, we will not disturb it on appeal.

192 F.3d 1367, 1385 (Fed. Cir. 1999).

We agree with the Court of International Trade that Commerce's determination that the debt restructuring was not specific is supported by substantial evidence and is otherwise in accordance with law. U.S. Steel's suggestion that Commerce should obtain and analyze the terms of each loan before and after restructuring has some appeal, because a loan that includes vastly more favorable terms after restructuring would confer a greater benefit than a similarly sized loan that includes only slightly more favorable terms after restructuring. As a practical matter, however, it is not unreasonable for Commerce to presume that the amount of benefits conferred by debt restructuring would roughly be proportional to the magnitude of the debts that were restructured, and as a result to compare the magnitudes of the debts that were restructured rather than to engage in the extensive investigations and calculations contemplated by U.S. Steel.

In AK Steel, this court recognized that "[d]eterminations of disproportionality and dominant use are not subject to rigid rules." Id. In particular, this court found that

Commerce did not err by comparing relative percentage benefits rather than absolute benefits, as requiring a comparison of absolute benefits "could produce an untenable result, i.e., that a benefit conferred on a large company might be disproportionate merely because of the size of the company." Id. Thus, this court determined that Commerce had properly exercised the latitude afforded it in determining the appropriate method by which to determine the specificity of benefits conferred by subsidies. Of course, that latitude does not excuse Commerce from choosing a reasonable method for determining the specificity of benefits. Indeed, Commerce itself has recognized that "the analysis of whether an enterprise or industry or group thereof is a dominant user of, or has received disproportionate benefits under, a subsidy program should normally focus on the level of benefits provided," even if sometimes "it may be impracticable or impossible to determine the relative level of benefits." Countervailing Duties: Final Rule, 63 Fed. Reg. 65,348, 65,359 (Nov. 25, 1998).

Here, we understand Commerce to have determined that obtaining the necessary information to engage in the extensive calculations contemplated by U.S. Steel was impracticable. Moreover, we understand Commerce to have determined that the magnitude of debt that is restructured is roughly proportional to the benefit conferred by restructuring. We have no reason to disagree with either determination. As a result, in our view Commerce's decision to compare the magnitude of the loans, a relatively simple endeavor, rather than to engage in exhaustive calculations using unavailable pre- and post-restructuring loan terms, was not unreasonable.

For the foregoing reasons, we conclude that Commerce's determination that the debt restructuring was not specific is supported by substantial evidence and otherwise in accordance with law.

### B. Commerce's Determination Not to Investigate U.S. Steel's Allegation of Equity Infusion

Commerce only investigates an equity infusion allegation when the allegation is specific and "supported by information establishing a reasonable basis to believe or suspect that the firm received an equity infusion that provides a countervailable benefit." 19 C.F.R. § 351.507(a)(7) (2004). Furthermore, a countervailable "benefit exists to the extent that the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made." Id. § 351.507(a)(1).

U.S. Steel argues that its allegation of equity infusion met the standard for initiation and that Commerce erred by not initiating an investigation into that allegation. U.S. Steel maintains that it showed that an initial invitation to bid for a steel mill in Thailand with only a moderate level of subsidies resulted in no bids, while a later invitation accompanied by a substantial level of subsidies resulted in several bids. Thus, U.S. Steel argues that RTG clearly and unequivocally induced bidders to invest in an unequityworthy company using the subsidies. It also contends that the evidence of equityworthiness cited by Commerce consisted wholly of self-serving statements by RTG.

We conclude that there is substantial evidence in the record supporting Commerce's determination that U.S. Steel did not submit information establishing a reasonable basis to believe or suspect that SSI received an equity infusion that provides

a countervailable benefit. Commerce rejected U.S. Steel's assumption that no reasonable investor would have invested in SSI without the incentives RTG provided because the information in the record did not support that assumption. New Subsidy Allegation Memo at 4. While U.S. Steel is correct that Commerce relied on RTG's testimony regarding the economic conditions in Thailand at the time SSI was formed, U.S. Steel is incorrect to the extent it characterizes Commerce as solely relying on self-serving statements by RTG. To the contrary, Commerce indicated that it relied not only on RTG's testimony, but also on exhibits supplied by RTG:

> Evidence on the record indicates that at the time of SSI's founding, economic conditions were right for the development of a Thai hot-rolled steel industry: the economy was growing rapidly and domestic demand for hot-rolled steel was increasing and was being met exclusively by imports. Indeed, the record shows that the BOI promoted a hot-rolled steel industry to meet this increasing domestic demand for hot-rolled steel products. See e.g., RTG Questionnaire Responses and Exhibits.

Id. at 5. Furthermore, those exhibits do support Commerce's conclusions. One of the exhibits includes a report prepared by the United Nations Industrial Development Organization summarizing various studies regarding iron and steel industry development in Thailand. The report indicates that a 1988 study concluded that if "the private sector was to take on the project" the "return on the whole scheme was 10%." The report also indicates that a 1990 study concluded that the "setup of [a] steelmaking plant" was "viable." The report, therefore, supports Commerce's conclusion that Thailand's economic conditions were right for the development of a Thai hot-rolled steel industry.

For the foregoing reasons, we conclude that Commerce's determination not to initiate an investigation into the allegation of equity infusion is supported by substantial

evidence and is otherwise in accordance with law. In light of this conclusion, we need

not reach Commerce's alternative finding that U.S. Steel's allegation was untimely.

### C. Commerce's Determination to Countervail the Entire Amount of Import Duty Exemptions

Commerce's ability to countervail import duty exemptions is governed by 19

C.F.R. § 351.519. In pertinent part, this regulation states:

> (a) (1) (i) Remission or drawback of import charges. In the case of the remission or drawback of import charges upon export, a benefit exists to the extent that the Secretary determines that the amount of the remission or drawback exceeds the amount of import charges on imported inputs that are consumed in the production of the exported product, making normal allowances for waste.
> . . . .
> (a) (3) (i) Remission or drawback of import charges. If the Secretary determines that the remission or drawback . . . of import charges confers a benefit under paragraph (a)(1) . . . of this section, the Secretary normally will consider the amount of the benefit to be the difference between the amount of import charges remitted or drawn back and the amount paid on imported inputs consumed in production for which remission or drawback was claimed.
> . . . .
> (a) (4) Exception. Notwithstanding paragraph (a)(3) of this section, the Secretary will consider the entire amount of an exemption, deferral, remission or drawback to confer a benefit, unless the Secretary determines that:
> (i) The government in question has in place and applies a system or procedure to confirm which inputs are consumed in the production of the exported products and in what amounts, and the system or procedure is reasonable, effective for the purposes intended, and is based on generally accepted commercial practices in the country of export . . . .

19 C.F.R. § 351.519 (2004).

Responding to the arguments the United States and U.S. Steel present on

appeal, RTG maintains that the Court of International Trade correctly decided that

Commerce's decision to countervail the entire import duty exemption was not supported

by substantial evidence or was not in accordance with law. RTG argues that the Court

of International Trade properly recognized the circularity of the construction Commerce sought to apply to 19 C.F.R. § 351.519. RTG characterizes Commerce as having "countervailed the entire amount of SSI's import duty exemption for what it deemed to be an excessive amount for waste." (Appellee Br. 17.) According to RTG, by doing so Commerce elevated the exception of § 351.519(a)(4) over the rule of § 351.519(a)(3). RTG points out that "waste" is not mentioned in § 351.519(a)(4), and that the only mention of waste is in subsection § 351.519(a)(1). It argues that reading § 351.519(a)(4) as justification for countervailing an entire drawback program "by simply finding an excessive allowance of any magnitude" renders § 351.519(a)(3) meaningless. (Appellee Br. 20.) RTG contends that Commerce should countervail an entire program only when the program is unreasonable. RTG maintains that its system is reasonable based on the acceptable practices in Thailand, and it also faults Commerce for referencing an accounting book that it alleges says nothing about whether waste includes recoverable or saleable scrap.

Next, RTG, relying on a dictionary definition of "waste," contends that "waste that can be sold is still waste." (Appellee Br. 27.) Furthermore, citing 19 C.F.R. § 191.23(c), RTG points out that the U.S. Customs and Border Protection's own drawback regulations only allow drawback on imported input reduced by recoverable and saleable waste. But RTG maintains that these regulations support rather than defeat its arguments because they recognize that "waste encompasses saleable scrap." (Appellee's Br. 31.)

Finally, RTG argues that the Court of International Trade properly rejected Commerce's reliance on the two "extraneous" sources of yield information, the parallel

antidumping investigation and the financial audit.  It argues that the rejection of Commerce's reliance on these sources of information does not undercut Commerce's statutory authority, because Commerce could have relied on RTG's system.  RTG, recognizing that the dispositive question is whether its system reasonably and effectively confirmed normal allowances for waste, argues that its system is reasonable and effective.  RTG contends that the two other sources of information only included slightly lower yield factors, and that Commerce never even assessed the reasonableness of the other sources of information.

We conclude that Commerce's determination to countervail the entire amount of the import duty exemptions is supported by substantial evidence and is otherwise in accordance with law.  Subsection 351.519(a)(1)(i) provides that a countervailable benefit exists where a program permits a drawback that "exceeds the amount of import charges on imported inputs that are consumed in the production of the exported product, making normal allowances for waste."  Moreover, pursuant to § 351.519(a)(4), the "entire amount" of the drawback is countervailable "unless" Commerce finds that

> [t]he government in question has in place and applies a system or procedure to confirm which inputs are consumed in the production of the exported products and in what amounts, and the system or procedure is reasonable, effective for the purposes intended, and is based on generally accepted commercial practices in the country of export . . . .

19 C.F.R. § 351.519(a)(4) (2004).  Only when Commerce finds that the government in question has the system required by § 351.519(a)(4) does it "normally consider the amount of the benefit to be the difference between the amount of import charges remitted or drawn back and the amount paid on imported inputs consumed in production for which remission or drawback was claimed" pursuant to § 351.519(a)(3)(i).  Here,

following the requirements of § 351.519(a)(4), Commerce determined that RTG's system for determining which inputs are consumed in the exported product, and in what amounts, is not reasonable because the system did not isolate and examine what was consumed in the production of the exported products and it did not consider in its analysis whether any of the scrap was recoverable and saleable. We see no reason to second guess the determination of Commerce that a system that does not account for recoverable and saleable scrap is not a reasonable system. In short, we defer to the expertise of Commerce in concluding that normal allowances for waste do not include allowing drawback on recoverable and saleable scrap. Unlike RTG, we do not fault Commerce for referencing accounting principles discussed in an accounting book to determine that recoverable and saleable scrap cannot be considered waste because it does have value and can be sold. Furthermore, we reject RTG's reliance on a dictionary definition of the term "waste." We also note that, contrary to RTG's argument, U.S. Customs and Border Protection's regulation on this very same issue, 19 C.F.R. § 191.23(c), supports Commerce's finding that reasonable systems do not allow drawback on imported inputs that are recoverable and resold.

The Court of International Trade found Commerce's logic to be circular. It understood Commerce to be countervailing the entire duty exemption because Commerce believes that any excess waste necessarily makes a system unreasonable. The court stated that "[t]he problem with [Commerce's] logic is that it renders § 351.519(a)(3)(i) meaningless, because there could never be a situation where only the excessive portion of the exemption would be countervailed." Decision, 341 F. Supp. 2d at 1324. Contrary to the characterization of Commerce's decision by RTG and the

Court of International Trade, however, Commerce did not countervail the entire drawback program simply because the program allowed for some amount of excessive drawback. We understand Commerce to have countervailed the entire drawback program because it found that program to be unreasonable for systematically allowing impermissible drawback of recoverable and resaleable scrap, resulting in unduly large amounts of impermissible drawback. We defer to this interpretation and application of § 351.519, Commerce's own regulation, because it is reasonable. See Lee v. United States, 329 F.3d 817, 822 (Fed. Cir. 2003) ("A great amount of deference is owed to an agency's interpretation of its own regulations."); NSK, Ltd. v. Koyo Seiko Co., 190 F.3d 1321, 1326 (Fed. Cir. 1999) ("[W]e accord substantial deference to Commerce's interpretations of its own regulations."). Commerce's application of § 351.519(a)(4) here does not mean that there could never be a situation where only the excessive portion of the import duty exemption would be countervailed. For example, Commerce might countervail only excess drawback when the excess drawback is caused by random rather than systematic error. As another example, Commerce might only countervail excess drawback that is relatively very small.

RTG agrees that Commerce should countervail an entire program when the program is unreasonable, but maintains that its system is reasonable based on the generally acceptable practices in Thailand. The Court of International Trade agreed. The requirement of a reasonable and effective system, however, is separate from the requirement that the system reflect local commercial practices. According to the text of 19 C.F.R. § 351.519(a)(4), to have only excess drawback countervailed, a system must be (1) reasonable, (2) effective for the purposes intended, and (3) based on generally

accepted commercial practices in the country of export. The language of the regulation does not clearly require that Commerce analyze the reasonableness of a system only from the perspective of the home country. Thus, we defer to Commerce's interpretation of its own regulation as allowing the reasonableness of a system to be evaluated using general accounting principles that might not be prevalent in the country of export, as that interpretation of the regulation is reasonable. See Lee, 329 F.3d at 822; NSK, 190 F.3d at 1326. Applying that principle here, we conclude that Commerce's reference to general accounting principles used outside Thailand was not reversible error.

Finally, we disagree with RTG's argument that the Court of International Trade was correct to disallow consideration of information generated by the parallel antidumping investigation and the financial audit. Commerce should be allowed to verify the data that foreign systems generate using information generated through independent financial and production audits. Indeed, pursuant to 19 U.S.C. § 1677m(i) and 19 C.F.R. § 351.307, Commerce is required to verify the factual basis for its determinations. And while the Court of International Trade was concerned that Commerce did not assess the reasonableness of the waste rates identified in these sources, Commerce did assess the reasonableness of the waste rates identified by RTG in light of the significant percent differences between the waste rates identified in those sources and RTG's reported waste rate. Investigating the reasonableness of RTG's system in light of these significant percent differences was not improper.

For the foregoing reasons, we conclude that Commerce's determination to countervail the entire amount of the import duty exemptions is supported by substantial evidence and is otherwise in accordance with law.

CONCLUSION

We affirm the Court of International Trade's findings on issues of the specificity of debt restructuring and the allegations of equity infusion, but we reverse its finding that Commerce erred in countervailing the entire amount of the import duty exemptions. We remand the case to the Court of International Trade for further proceedings consistent with this opinion.

AFFIRMED-IN-PART, REVERSED-IN-PART, and REMANDED