**Slip Op. 06-117**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| ROYAL THAI GOVERNMENT, ET AL., | |
| Plaintiffs, | Before: Richard W. Goldberg, Senior Judge |
| v. | |
| UNITED STATES, | Consol. Court No. 02-00026 |
| Defendant, | |
| and | |
| UNITED STATES STEEL CORP., | |
| Defendant-Intervenor. | |

**OPINION**

[Motions for reconsideration granted.  Commerce's final affirmative countervailing duty determination remanded with instructions.]

Date: July 26, 2006

Willkie Farr & Gallagher LLP (Kenneth J. Pierce, Robert Edward DeFrancesco, and Victor S. Mroczka) for Plaintiffs the Royal Thai Government and Sahaviriya Steel Industries Public Company Limited.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Patricia M. McCarthy); Mykhaylo A. Gryzlov, International Attorney-Advisor, Office of the Chief Counsel for the Import Administration, United States Department of Commerce, for Defendant United States.

Skadden, Arps, Slate, Meagher & Flom LLP (John J. Mangan) for Defendant-Intervenor United States Steel Corporation.

Goldberg, Senior Judge: In Royal Thai Government v. United States, 436 F.3d 1330 (Fed. Cir. 2006) (**"Royal Thai II"**), the United States Court of Appeals for the Federal Circuit (the **"Federal Circuit"**) remanded this case for further proceedings following that court's reversal-in-part of Royal Thai Government v. United States, 28 CIT ___, 341 F. Supp. 2d 1315 (2004) (**"Royal Thai I"**), familiarity with which is presumed. Pending before the Court are motions for reconsideration which seek review of two issues previously considered moot as a result of a now overturned holding in Royal Thai I. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(c).

## I.   BACKGROUND

In Royal Thai I, the Court reviewed the final affirmative countervailing duty determination made by the U.S. Department of Commerce (**"Commerce"**) with respect to certain hot-rolled carbon steel flat products from Thailand (**"subject imports"**). See Certain Hot-Rolled Carbon Steel Flat Products From Thailand, 66 Fed. Reg. 50410 (Dep't Commerce Oct. 3, 2001) (final determination) (**"Final Determination"**); Issues and Decision Memorandum in the Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products from Thailand, C-549-818 (Sept. 21, 2001), available at http://ia.ita.doc.gov/frn/summary/thailand/01-24753-1.txt (**"Decision Memo"**).

The Court affirmed Commerce's decision not to countervail a debt restructuring program administered by Plaintiff the Royal Thai Government (**"RTG"**), as well as Commerce's decision not to investigate alleged equity infusions in Plaintiff Sahaviriya Steel Industries Public Company Limited (**"SSI"**) made by RTG. Royal Thai I, 28 CIT at ___, 341 F. Supp. 2d at 1317-23. However, the Court reversed Commerce's decision to countervail the entire amount of duty exemptions, or drawbacks, provided by RTG for SSI's imports of steel slab used as the sole raw material in the manufacture of hot-rolled steel coil for export. See id. at ___, 341 F. Supp. 2d at 1323-26. As a result of this holding, the countervailing duty rate applicable to SSI was rendered de minimis and, accordingly, the Court instructed Commerce to find that no countervailable subsidies were provided to SSI. See id. at ___, 341 F. Supp. 2d at 1326-27. Also as a result of this holding, the Court declined to address two additional issues raised by the parties with respect to (1) the sustainability of Commerce's determination that SSI (and its subsidiary, Prachuab Port Company (**"PPC"**)) received a countervailable regional subsidy from RTG through the provision of electricity at less than adequate remuneration and (2) the appropriate benchmark to be used in calculating the alleged countervailable benefit received from the imported steel slab duty exemptions. See id. at ___, 341 F. Supp. 2d at 1326. The

Court reasoned that these issues had been rendered moot by the calculation of a de minimis countervailing duty rate and the corresponding, legally-compelled finding that no countervailable subsidies were provided to SSI.[1]  Id.

On appeal, however, the Federal Circuit reversed this Court's holding with respect to RTG's provision of duty exemptions to SSI for steel slab imports.  Royal Thai II, 436 F.3d at 1339-41.  The Federal Circuit instead upheld Commerce's decision to countervail the entire amount of these import duty exemptions received by SSI.  Id.  In light of this reversal, the Federal Circuit remanded the case for this Court to conduct further proceedings consistent with Royal Thai II.

Shortly thereafter, on March 20, 2006, Plaintiffs RTG and SSI filed a motion for reconsideration, requesting that the Court reexamine their claim that Commerce erroneously concluded that SSI received a countervailable regional subsidy from RTG through the provision of electricity at less than adequate remuneration.  On April 20, 2006, Defendant-Intervenor United

---

[1] That is, with respect to issue (1), it was unnecessary to review Commerce's decision to countervail the provision of electricity because, even if the provision of electricity was countervailable, the resulting cumulative countervailing duty rate would still be de minimis and thus non-actionable under U.S. countervailing duty law.  With respect to issue (2), it was unnecessary to resolve the dispute concerning the appropriate calculation of the benefit received from the imported steel slab duty exemptions, since the Court determined that these exemptions were not countervailable.

States Steel Corporation (**"U.S. Steel"**) filed a second motion for reconsideration, requesting that the Court also reassess its claim that Commerce had selected an incorrect benchmark when calculating the countervailable benefit received by SSI from the steel slab duty exemptions. This case is now properly[2] before the Court upon Plaintiffs' and Defendant-Intervenor's motions, consolidated for purposes of this opinion.

## II.  STANDARD OF REVIEW

With respect to the motions for reconsideration, the Court will not exercise its discretion to disturb a previous decision unless it is "manifestly erroneous." Former Employees of Quality Fabricating, Inc. v. United States, 28 CIT ___, ___, 353 F. Supp. 2d 1284, 1288 (2004) (quotation marks omitted). "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Doe v. New York City Dep't of Social Servs., 709 F.2d 782, 789 (2d Cir. 1983) (quotation marks omitted).

---

[2] As Defendant the United States (**"U.S."**) correctly notes, the Court was initially without jurisdiction to consider Plaintiffs' motion. The motion was filed seven days before the issuance of the Federal Circuit's mandate in this case – the date upon which this Court regained jurisdiction. See Tronzo v. Biomet, Inc., 318 F.3d 1378, 1380 (Fed. Cir. 2003) ("[T]he district court regains jurisdiction when the appellate mandate issues."). The Court now possesses jurisdiction to consider Plaintiffs' motion.

With respect to the underlying Final Determination, the Court must uphold a determination made by Commerce if it is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i) (1999).  Concerning the substantial evidence requirement, the U.S. Supreme Court has defined this term to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," taking into account the record as a whole.  Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  It requires "more than a mere scintilla" but is satisfied by "something less than the weight of the evidence . . . ."  Luoyang Bearing Factory v. United States, 27 CIT ___, ___, 288 F. Supp. 2d 1369, 1370 (2003).

## III. DISCUSSION

### A.   The Motions for Reconsideration Are Well-Founded in Light of the Federal Circuit's Decision in Royal Thai II

Plaintiffs' and Defendant-Intervenor's unopposed motions both argue that the Federal Circuit's reversal of a key holding in Royal Thai I had the effect of resurrecting two issues in this case which were previously considered moot.

The Court agrees.  Because Commerce's decision to countervail the entire amount of the import duty exemptions received by SSI has been sustained by the Federal Circuit, the

Court can no longer say with certainty that SSI's countervailing duty rate is de minimis. Rather, if sustained, Commerce's decision to countervail RTG's provision of electricity to SSI would result in a combined countervailing duty rate of 2.38 percent. This exceeds the two percent de minimis (and thus non-actionable) rate afforded developing countries like Thailand under U.S. countervailing duty law. See 19 U.S.C. § 1671b(b)(4)(B) (1999); Developing and Least-Developed Country Designations under the Countervailing Duty Law, 63 Fed. Reg. 29945, 29948 (USTR June 2, 1998) (interim final rule). In addition, SSI's countervailing duty rate could be increased even more if, as contended by U.S. Steel, Commerce erred in its calculation of the benefit received by SSI with respect to the steel slab import duty exemptions.

As such, it is clear that, in light of the intervening decision in Royal Thai II, it is "manifestly erroneous" to view the issues raised by Plaintiffs and Defendant-Intervenor in their respective motions as moot. Former Employees of Quality Fabricating, 28 CIT at ___, 353 F. Supp. 2d at 1288. The motions for reconsideration are therefore granted and the Court now proceeds to its substantive analysis of these two issues.

**B.    With Regard to Plaintiffs' Claim, Commerce's Decision to
       Countervail RTG's Provision of Electricity to SSI Is
       Supported by Substantial Evidence and in Accordance with Law**

During the period of investigation, the provision of
electricity to residential and commercial consumers in Thailand
was largely controlled by RTG through various government
entities.  Decision Memo at 11.  The National Energy Policy
Council developed electricity rate-setting policy, which was
then implemented by the National Energy Policy Office (**"NEPO"**).
NEPO accomplished its mission through three additional RTG
authorities: (1) the Electricity Generating Authority of
Thailand (**"EGAT"**), which was responsible for generation and
transmission; (2) the Metropolitan Electricity Authority
(**"MEA"**), which was responsible for distribution in and around
Bangkok; and (3) the Provincial Electricity Authority (**"PEA"**),
which was responsible for distribution in the remainder of
Thailand.  Id.  PEA's delivery costs were higher than MEA's.
Id. at 12.  Nonetheless, "RTG maintain[ed] a 'uniform national
tariff policy' which provide[d] that consumers in the same
customer category [paid] the same rate regardless of whether
they [were] in MEA's distribution area or PEA's distribution
area."  Id. at 11.  In order to implement this uniform tariff
policy, EGAT gave a discount to PEA and applied a surcharge to
MEA for their respective electricity purchases (the **"internal
cross-subsidy"**).  Id. at 12.

In the Final Determination, Commerce concluded that SSI's receipt of electricity from PEA under RTG's uniform tariff policy constituted a countervailable subsidy.  Final Determination, 66 Fed. Reg. at 50412.  To reach this conclusion, Commerce found that the statutory criteria establishing the existence of a countervailable subsidy had been met: (1) a financial contribution was provided by a government entity (19 U.S.C. § 1677(5)(B)(i)); (2) the financial contribution was specific to an enterprise or industry (19 U.S.C. § 1677(5A)(D)); and (3) the financial contribution resulted in a benefit to its recipient (19 U.S.C. § 1677(5)(B)).  See Decision Memo at 13-16.

Plaintiffs argue that Commerce's determination with respect to each of these criteria was flawed.  For the reasons set forth below, the Court upholds this aspect of the Final Determination.

**1.    Commerce Reasonably Determined that RTG's Provision of Electricity to SSI Constituted a Potentially Countervailable Financial Contribution and Not "General Infrastructure"**

Plaintiffs initially contend that Commerce erred in finding that RTG's provision of electricity to SSI constituted a potentially countervailable financial contribution.  Plaintiffs' Memorandum in Support of Motion for Judgment on the Agency Record (**"Pls.' Br."**) at 21.  Instead, Plaintiffs insist that the governmental provision of electricity to SSI properly should have been considered "general infrastructure," and therefore

exempt from U.S. countervailing duty law.  Id. at 22 (quoting 19
U.S.C. § 1677(5)(D)(iii)).  Plaintiffs advance three arguments
in support of this position.  First, Plaintiffs argue that
Commerce's past practice, authoritative sources, and common
sense dictate that the provision of electricity is
infrastructure.  Id. at 22-25.  Second, Plaintiffs argue that
the record evidence demonstrates that RTG's provision of
electricity to SSI was clearly undertaken to benefit the "public
welfare," the standard employed by Commerce to identify non-
countervailable general infrastructure.  Id. at 26 (quoting
Countervailing Duties, 63 Fed. Reg. 65348, 65378 (Dep't Commerce
Nov. 25, 1998) (final rule) (**"CVD Preamble"**)).  Third,
Plaintiffs argue that nothing in the CVD Preamble, the
countervailing duty regulations,[3] or past court cases concerning
electricity preclude a finding that the provision of electricity
may constitute general infrastructure.  Id. at 27-30.

    The Court finds that Commerce reasonably considered RTG's
provision of electricity to SSI to be a potentially
countervailable financial contribution and not general
infrastructure.  "General infrastructure" is a term of art in
U.S. countervailing duty law.  The relevant statute directs that
goods or services which constitute general infrastructure may

---

[3] References to the countervailing duty regulations are to 19
C.F.R. § 351.101 et seq.

not be countervailed.  See 19 U.S.C. § 1677(5)(D)(iii)(1999).

Commerce has interpreted this statutory language to encompass

"infrastructure that is created for the broad societal welfare

of a country, region, state or municipality."  19 C.F.R. §

351.511(d) (2006).  Commerce elaborated on this interpretation

by noting that "the type of infrastructure per se is not

dispositive of whether the government provision constitutes

'general infrastructure.'  Rather, the key issue is whether the

infrastructure is developed for the benefit of society as a

whole."  CVD Preamble, 63 Fed. Reg. at 65378.  Commerce refers

to this analysis as the "public welfare concept."  Id.

Plaintiffs do not dispute the reasonableness of Commerce's

methodological approach to identifying general infrastructure

for purposes of 19 U.S.C. § 1677(5)(D)(iii); rather, they

contend that Commerce misapplied the public welfare concept to

the facts of this case.

     However, even assuming arguendo that RTG's provision of

electricity was necessarily infrastructure (as urged by

Plaintiffs), substantial evidence supports Commerce's conclusion

that it was not "general infrastructure" under U.S.

countervailing duty law.  Commerce verified that RTG's uniform

tariff policy was intended to serve three purposes: (1) provide

electricity to low-income consumers; (2) ensure rural

electrification; and (3) promote economic activity outside of

the congested Bangkok metropolitan area.  Decision Memo at 36-37.  Although these three purposes could be fairly characterized as "broad social goals," id. at 35, Commerce reasonably found that they nonetheless did not satisfy the public welfare concept.  On their face, the purposes underlying the uniform tariff policy did not "benefit society as a whole," CVD Preamble, 63 Fed. Reg. at 65378, but instead primarily benefited only a portion of Thai society.  While it perhaps could be argued that these purposes, if fulfilled, would have bestowed a residual benefit to the greater Thai society, there was no record evidence supporting such speculation about the attenuated effects of the uniform tariff policy.

In addition, it is noteworthy that the alleged infrastructure at issue here was the electricity itself and "not the physical plant associated with the generation, transmission and distribution of the electricity."  Decision Memo at 35. This is an important distinction.  Commerce generally views electricity facilities – but not their issue – as constituting general infrastructure.  See Bethlehem Steel Corp. v. United States, 26 CIT 1003, 1011, 223 F. Supp. 2d 1372, 1379 (2002) (upholding Commerce's finding of no financial contribution from electricity facilities constituting general infrastructure). This is because an electric power facility or distribution grid is used repeatedly by the entire consuming public; in contrast,

once used by a single consumer, a kilowatt of electricity is gone forever. Plaintiffs counter that, for each kilowatt of electricity charged by RTG through PEA, SSI paid a pro rata portion of the costs associated with maintaining the electricity facilities. Pls.' Br. at 25. Plaintiffs essentially argue that this overhead charge included in the electricity's price transformed the electricity into general infrastructure. In the Court's view, this factor alone cannot support a finding of general infrastructure. After all, a certain amount of overhead is included in the price of virtually every good or service available to consumers. It is difficult to imagine a government's provision of goods or services which could not be connected to recognized general infrastructure, however marginally, through overhead charges. Because Plaintiffs' position would eviscerate Commerce's public welfare concept and the underlying statutory directive, the Court finds it unpersuasive. Viewed in this light, Commerce's decision to consider RTG's provision of electricity to SSI as non-general infrastructure is reasonable.

Moreover, as noted briefly <u>supra</u>, Commerce's decision is consistent with the agency's past practice. Since the passage of the Uruguay Round Agreements Act (**"URAA"**), from which the existing definition of financial contribution derives, Commerce has uniformly viewed the provision of electricity as a financial

contribution, subject to specificity and benefit analysis to determine actual countervailability.  See, e.g., Stainless Steel Sheet and Strip in Coils from the Republic of Korea, 69 Fed. Reg. 2113, 2116 (Dep't Commerce Jan. 14, 2004) (final determination); Steel Wire Rod from Venezuela, 62 Fed. Reg. 55014, 55021-22 (Dep't Commerce Oct. 22, 1997) (final determination); Steel Wire Rod from Trinidad and Tobago, 62 Fed. Reg. 55003, 55006-07 (Dep't Commerce Oct. 22, 1997) (final determination).  This is in keeping with Commerce's pre-URAA practice.  See, e.g., Oil Country Tubular Goods from Argentina, 62 Fed. Reg. 32307, 32309-11 (Dep't Commerce June 13, 1997) (preliminary determination); Certain Steel Products from Spain, 58 Fed. Reg. 37374, 37380-81 (Dep't Commerce July 9, 1993) (final determination); Ferrosilicon from Venezuela, 58 Fed. Reg. 27539, 27539-40 (Dep't Commerce May 10, 1993) (final determination).[4]

     Nonetheless, Plaintiffs argue that nothing in these and other sources necessarily precludes a finding of general

---

[4] It is noteworthy that the Statement of Administrative Action (**"SAA"**) accompanying the URAA indicated that the new definition of financial contribution was intended to "encompass the types of subsidy programs generally countervailed by Commerce in the past."  SAA, H.R. Doc. No. 103-465, at 927 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040, 4240, 1994 WL 761793.  Congress has mandated that the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of . . . [the URAA] in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d) (2005).

infrastructure with respect to the provision of electricity. Unfortunately for Plaintiffs, this observation, even if true, is of no moment. Plaintiffs' burden as movant requires more than a showing that their desired alternative to Commerce's determination is theoretically permissible under existing law. Rather, Plaintiffs must demonstrate that Commerce's determination is actively contrary to that law. See 19 U.S.C. § 1516a(b)(1)(B)(i) (1999). Plaintiffs have not met that burden here.

Accordingly, the Court upholds Commerce's determination that RTG's provision of electricity to SSI constituted a potentially countervailable financial contribution as in accordance with law and supported by substantial evidence.

**2.   Commerce Reasonably Determined That RTG's Provision of Electricity Satisfied the Requirements of Regional Specificity**

Plaintiffs next contend that Commerce erred in finding that RTG's provision of electricity was specific to SSI as required by 19 U.S.C. § 1677(5)(A) to establish countervailability. Pls.' Br. at 30. In particular, Plaintiffs claim that the requirements of regional specificity, a sub-set of specificity analysis under U.S. countervailing duty law, were not met in this case. Id. Plaintiffs argue that RTG's provision of electricity under the uniform tariff policy was plainly not "limited to an enterprise or industry located within a

designated geographical region" in Thailand, the statutory standard for a finding of regional specificity. Id. at 30-31 (quoting 19 U.S.C. § 1677(5A)(D)(iv) (1999)). Rather, Plaintiffs insist that "regional specificity cannot exist" here because the uniform tariff policy ensured that "[i]ndustrial companies in the same customer categories located anywhere in Thailand [paid] the same electricity rates." Pls.' Br. at 31.

The Court finds that Commerce reasonably determined that RTG's provision of electricity satisfied the requirements of regional specificity. Indeed, Plaintiffs' own argument reveals why a finding of regional specificity is justified here. As noted supra, Commerce verified (and Plaintiffs do not contest) that the cost of distributing electricity in PEA's distribution area was higher than the cost of distributing electricity in MEA's distribution area. Nonetheless, PEA-serviced companies paid the same electricity rates as their MEA analogs. As a result, PEA-serviced companies had access to something MEA-serviced companies did not: relatively cheaper electricity than RTG's costs otherwise dictated. Access to this relatively cheaper electricity was expressly contingent upon only one factor: a company's regional location within Thailand. As such, it was regionally specific.[5] Plaintiffs are therefore correct

_____

[5] The Court notes that no additional showing of specificity as to SSI is required under U.S. countervailing duty law because

that "[i]f one producer subject to an investigation is located within the PEA region and another is in the MEA region, only the one in the PEA region will be countervailed even though both are paying the exact same rate for electricity."  Pls.' Br. at 31-32.  However, this result is not "absurd," id. at 32; to the contrary, it is the logical outcome of regional specificity analysis under the facts of this case.

Accordingly, the Court upholds Commerce's determination that RTG's provision of electricity to SSI satisfies the requirements of regional specificity as in accordance with law and supported by substantial evidence.

### 3.    Commerce Reasonably Determined that RTG's Provision of Electricity to SSI Conferred a Countervailable Benefit in the Amount Calculated in the Final Determination

Plaintiffs next contend that Commerce erred both in its finding that RTG's provision of electricity to SSI conferred a countervailable benefit and in its calculation of that benefit.  Pls.' Br. at 32-45.  In support of this position, Plaintiffs make two principal arguments, discussed separately below.

---

"subsidies provided by a central government to particular regions (including a province or a state) are specific regardless of the degree of availability or use within the region."  SAA, H.R. Doc. No. 103-465 at 932, 1994 U.S.C.C.A.N. at 4244.

### a.    *Commerce Reasonably Found that RTG Did Not Receive Adequate Remuneration for Its Provision of Electricity to SSI*

First, Plaintiffs argue that Commerce erred in finding that RTG provided electricity to SSI for less than adequate remuneration, as required by 19 C.F.R. § 351.511 to establish receipt of a countervailable benefit.  Id. at 32.  Plaintiffs contend that, to the contrary, record evidence demonstrated that (1) RTG's price-setting philosophy was based on market principles; (2) the electricity rates applicable to SSI and its subsidiary, PPC, were in excess of market-based costs; and (3) PEA made a significant operating profit in 1999.  Id. at 32-39. Plaintiffs argue that this evidence made clear that RTG did in fact receive adequate remuneration from SSI and, consequently, did not confer a countervailable benefit by the provision of electricity.  Id.

The Court finds that Commerce reasonably determined that RTG provided electricity to SSI for less than adequate remuneration.  Pursuant to 19 U.S.C. § 1677(5)(E)(iv), "less than adequate remuneration" is the standard used by Commerce to measure the amount of countervailable benefit, if any, conferred by a specific financial contribution consisting of goods or services.  See 19 U.S.C. § 1677(5)(E)(iv) (1999); 19 C.F.R. § 351.511(a)(1) (2006).  To determine the adequacy of remuneration of an investigated good or service, Commerce prefers to compare

the government price to available country-specific or world market prices. See 19 C.F.R. § 351.511(a)(2)(i)-(ii) (2006). However, when such prices are unavailable, Commerce will resort to an assessment of "whether the government price is consistent with market principles." Id. § 351.511(a)(2)(iii). This "market principles" analysis is an examination "of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination." CVD Preamble, 63 Fed. Reg. at 65378. In this case, Commerce concluded that the nature of Thailand's electricity market necessitated recourse to market principles analysis. See Decision Memo at 14. Plaintiffs do not dispute this methodological choice; rather, they contend that Commerce misapplied market principles analysis to the facts of this case.

However, substantial evidence supports Commerce's conclusion that the rate set by RTG for the provision of electricity to SSI was not consistent with market principles. In the Final Determination, Commerce conceded Plaintiffs' first argument - that, on its face, pricing under RTG's uniform tariff policy appeared to have been set in accordance with market principles. Decision Memo at 14. This was because RTG (through NEPO) required that the electricity rates underlying the uniform tariff policy be sufficient to cover the marginal costs of EGAT,

MEA, and PEA, as well as meet specified financial criteria for each of these entities (i.e., a minimum self-financing ratio, a maximum debt-to-equity ratio, and a minimum debt-service coverage ratio).  Id.  At verification, Commerce asked RTG officials to document that this market-based pricing philosophy had in fact been implemented – i.e., to provide the most recent analysis of whether the electricity rates were sufficient to cover marginal costs and meet the specified financial criteria. Id.  This was a reasonable request for Commerce to make during verification.  See Bomont Indus. v. United States, 14 CIT 208, 209, 733 F. Supp. 1507, 1508 (1990) (noting that "verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness").[6] Surprisingly, RTG officials informed Commerce that copies of this important analysis were not retained.  Decision Memo at 14.

Instead, RTG sought to rely on a previously submitted report prepared by PricewaterhouseCoopers (**"PWC"**) which allegedly demonstrated that customers in the same categories as SSI and PPC generated revenues well in excess of marginal costs. Id. at 37.  Although Commerce considered this report, the agency found that it was not "probative of whether the RTG, through PEA, [received] adequate remuneration for the electricity sold

---

[6] Indeed, Plaintiffs admit that "these information requests were not necessarily unreasonable."  Pls.' Br. at 42.

in the region" because "PWC did not examine the issue of what rates PEA should or would charge to any of its customer classes in the absence of [the internal cross-subsidy.]"  Id. at 38-39. Indeed, Commerce found that RTG expressly required PWC to assume the continuation of the internal cross-subsidy in its review of the electricity rates.  Id. at 38.  In the Court's view, Commerce reasonably discounted the probative value of the PWC report because it assumed the very issue which lies at the heart of the market principles analysis in this case: whether, absent the internal cross-subsidy, PEA was able to cover its marginal costs and meet RTG's own specified financial criteria.[7]

In contrast, Commerce reasonably found highly probative a different report, issued directly by NEPO, which stated that "the financial transfers from the MEA to the PEA are . . . essential so that the financial status of the two utilities would meet the specified criteria."  Decision Memo at 39

---

[7] Because of the assumed continuation of the internal cross-subsidy, the PWC report did not distinguish between customers located in the PEA and MEA distribution areas.  As a result, PWC's statement (reflected in the NEPO report) that "[customers in SSI and PPC's pricing categories] will generally pay for electricity in excess of the marginal costs" cannot be taken to mean, as Plaintiffs insist, that SSI, PPC, or any other customer in the PEA distribution area necessarily overpaid for the provision of electricity.  App. to Pls.' Br., App. 9 (RTG Questionnaire Response dated Feb. 7, 2001), Ex. J-8 at 13. Despite Plaintiffs' assertions to the contrary, the Court finds that the PWC report simply does not allow for this level of analytical precision.

(quoting NEPO report at 23).  Like Commerce, the Court views

this admission by RTG as supporting the conclusion that, without

the internal cross-subsidy, PEA could not have satisfied the

market principles ostensibly underlying the uniform tariff

policy.  See id.  Plaintiffs attempt to rebut this evidence by

noting that PEA's financial reports paint a different picture –

that PEA actually turned a profit in 1999 even without the

internal cross-subsidy.[8]  Pls.' Br. at 38.  However, Commerce was

not able to determine the accuracy of this financial information

at verification due to chronic inconsistencies in the data

presented and its late submission.[9]  See App. to Pls.' Br., App.

---

[8] It is noteworthy that Plaintiffs' observation is true only if
PEA's financials are adjusted to exclude foreign exchange losses
recognized in 1999.  Pls.' Br. at 38.  Like Commerce, the Court
is not fully convinced that such an adjustment is appropriate in
evaluating PEA's financial status for purposes of market
principles analysis in this case.  See Decision Memo at 40.
Nevertheless, the Court need not resolve this dispute in order
to dispose of this issue.

[9] Plaintiffs argue that Commerce should have provided additional
time for RTG's non-Anglophone officials to respond to Commerce's
allegedly confusing information requests concerning the
electricity authorities' finances.  See Pls.' Br. at 42.
However, the Court finds nothing unusually complicated or
confusing about the conduct of verification here.  Commerce's
verification outline and preliminary determination in this case
clearly put Plaintiffs on notice of the importance of the
operation of the internal cross-subsidy to Commerce's analysis
of the adequacy of remuneration.  See Certain Hot-Rolled Carbon
Steel Flat Products From Thailand, 66 Fed. Reg. 20251, 20259-60
(Dep't Commerce Apr. 20, 2001) (preliminary determination).
Even if Plaintiffs were not fully prepared for Commerce's
specific information requests, Commerce afforded Plaintiffs
multiple opportunities during verification to produce the

5 (RTG Verification Report dated Aug. 17, 2001) at 17.

Undaunted, Plaintiffs note that Commerce was able to at least

verify the fact that PEA was required to pay a large remittance

to RTG's Ministry of Finance in 1999, which Plaintiffs contend

was a clear demonstration that PEA in fact made a profit for

that year.  Pls.' Br. at 38.  However, the record evidence does

not demonstrate that this remittance was at all related to PEA's

relative profitability.  Although expressly provided the

_____

requested information.  Plaintiffs were unable to do so,
notwithstanding the fact that this information was very similar
to analyses regularly performed by RTG.  Under these
circumstances, Commerce did not err by refusing to allow
Plaintiffs to submit additional financial information after
verification.  Although Commerce's regulations provide that
"factual information requested by the verifying officials from a
person normally will be due no later than seven days after the
date on which the verification of that person is completed," 19
C.F.R. § 351.301(b)(1) (2006), Commerce is also statutorily
mandated to verify all information relied upon in a final
determination.  See 19 U.S.C. § 1677m(i)(1) (1999).  Read
together, these requirements mean that Commerce may consider
information received after verification only when it
corroborates, reinforces, explains, or expands on already
verified questionnaire responses or other data.  The post-
verification information offered by Plaintiffs failed to meet
this standard, as Commerce was consistently unable to confirm
the electricity authorities' finances during verification.
Although it was within Commerce's discretion to extend the time
limit of verification, see Fujian Mach. & Equip. Imp. & Exp.
Corp. v. United States, 25 CIT 1150, 1161, 178 F. Supp. 2d 1305,
1319 (2001), Commerce was under no obligation to do so here
because the agency had already "give[n] respondents a reasonable
opportunity to participate in the review and verification
process."  Id. (quotation marks omitted); see also Tianjin Mach.
Imp. & Exp. Corp. v. United States, 28 CIT ___, ___, 353 F.
Supp. 2d 1294, 1303-1304 (2004) (noting Commerce's discretion in
"forc[ing] parties to submit information within a specified time
frame in the interests of fairness and efficiency").

opportunity by Commerce to make this point with respect to profitability during verification, RTG officials "did not elaborate on the reasoning" behind PEA's remittance.  App. to Pls.' Br., App. 5 (RTG Verification Report dated Aug. 17, 2001) at 14.  As such, this evidence fails to rebut Commerce's conclusion that the internal cross-subsidy was necessary for PEA to meet RTG's specified financial criteria.

Nonetheless, Plaintiffs contend that, even if the internal cross-subsidy was necessary, record evidence demonstrates that this was true only because of the high costs associated with servicing agricultural and rural consumers (i.e., not consumers in SSI and PPC's customer categories).  Pls.' Br. at 36 n.129, 37.  Plaintiffs argue that the adequacy of remuneration should be judged on the government costs and prices involved in providing electricity to the particular customer categories associated with the investigated companies.  Id.  This is a correct statement of the law and Commerce's past practice, see, e.g., Carbon and Certain Alloy Steel Wire Rod from Trinidad and Tobago, 67 Fed. Reg. 6001, 6008 (Dep't Commerce Feb. 8, 2002) (preliminary determination); Steel Wire Rod from Venezuela, 62 Fed. Reg. at 55021-22; however, Commerce's ability to make such a particularized determination may be limited by the information uncovered during an investigation.  As noted supra, despite multiple requests, Commerce was not able to verify here the true

costs associated with servicing companies like SSI and PPC

absent the internal cross-subsidy.  Moreover, at verification,

Commerce took the extra step of exploring this line of analysis

in a non-quantitative manner, asking RTG to simply explain why

the uniform tariff policy applied to consumers like SSI and PPC

if its purpose was to ensure the provision of electricity to

underserved agricultural and rural consumers.  RTG officials

responded that "the goal was also to promote economic activity

outside of the Bangkok area."  App. to Pls.' Br., App. 5 (RTG

Verification Report dated Aug. 17, 2001) at 15.  Based on this

telling response and the other factual findings noted supra,

Commerce concluded that RTG had given social criteria precedence

over market principles, resulting in the receipt of less than

adequate remuneration from PEA-serviced companies like SSI and

PPC.[10]  See Decision Memo at 38.  There is ample evidentiary

---

[10] Plaintiffs also argue that Commerce's conclusion that social
criteria took precedence over market principles is inconsistent
with Commerce's separate finding that RTG's provision of
electricity did not constitute general infrastructure for
purposes of financial contribution analysis.  See Pls.' Br. at
34.  The Court disagrees.  This is not an example of Commerce
trying to "have it both ways."  Id.  A government program may
well be motivated by social criteria which do not provide the
broad societal benefits necessary to constitute general
infrastructure under U.S. countervailing duty law.  Indeed, the
Court imagines that some sort of social objective underlies most
programs which give rise to countervailing duties.

support for this conclusion and, accordingly, the Court finds no
error here by Commerce.[11]

> **b.      *Commerce Properly Calculated the Countervailable Benefit Conferred on SSI by RTG's Provision of Electricity***

Finally, Plaintiffs argue that Commerce erred in its
calculation of the countervailable benefit received as a result
of RTG's provision of electricity for less than adequate
remuneration.  Pls.' Br. at 43.  Plaintiffs contend that
Commerce should have adjusted the calculation to take into
account (1) "the lump-sum adjustment to the [MEA] surcharge and
[PEA] deduction that was made after" the period of
investigation, Decision Memo at 15, and (2) the resales of
electricity by SSI to companies not associated with production
of the subject imports during the period of investigation.
Pls.' Br. at 43.

The Court finds that Commerce properly denied the
adjustments requested by Plaintiffs.  First, in determining the
net amount of countervailable subsidy received by SSI, Commerce
appropriately refused to modify its calculations to take into
account the lump-sum adjustment to the internal cross-subsidy

---

[11] Plaintiffs also argue that Commerce's use of adverse facts available to determine that RTG received less than adequate remuneration was unwarranted.  <u>See</u> Pls.' Br. at 40-43.  Because the Court concludes that substantial evidence supported this aspect of Commerce's determination (thereby rendering superfluous the agency's recourse to adverse facts available), the Court need not address this argument by Plaintiffs.

retroactively made by RTG. 19 U.S.C. § 1677(6) provides that Commerce may make only certain enumerated deductions from the gross countervailable subsidy amount in order to arrive at the net countervailable subsidy amount. See 19 U.S.C. § 1677(6) (1999). Deductions may be made for:

> (A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy,
> (B) any loss in the value of the countervailable subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and
> (C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received.

Id. § 1677(6)(A)-(C). Plaintiffs' requested adjustment plainly does not fall within any of these categories: RTG made a retroactive adjustment to the internal cross-subsidy for accounting purposes, not to offset or reduce the value of the subsidy in any way. Indeed, as Commerce found, it would be "inappropriate" to consider this retroactive adjustment because, due to its timing, the adjustment clearly "did not affect the actual rates paid" by SSI to RTG during the period of review. Decision Memo at 16. As such, the unadjusted calculation of the net countervailable subsidy is a more accurate reflection of the amount of benefit received by SSI through RTG's provision of electricity and Commerce properly used it.

Second, in calculating the ad valorem subsidy rate for the subject imports, Commerce also properly included in its calculation the subsidized electricity associated with the resales of electricity made by SSI.  It is uncontested that SSI did resell some of its subsidized electricity to companies not involved in the production or sale of subject imports during the period of investigation.  Id. at 41.  Plaintiffs argue that the electricity associated with the resales was "tied" to non-subject merchandise and therefore, pursuant to Commerce's regulations, should have been excluded from the calculation of the ad valorem subsidy rate for the subject imports.  19 C.F.R. § 351.525(b)(5) (2006) (requiring Commerce to attribute subsidy tied to the production or sale of a particular product only to that product).

However, Commerce has made clear that, in identifying a tied subsidy, the agency looks to "the stated purpose of the subsidy or the purpose we evince from record evidence at the time of bestowal."  CVD Preamble, 63 Fed. Reg. at 65403 (emphasis added).  Here, Commerce found that "at the point of bestowal, PEA [did] not direct or require SSI to sell [the electricity] or distribute [the electricity] to any other entities."  Id. at 32 (emphasis added).  Indeed, Commerce found that "SSI [was] the only entity to which PEA [provided] the electricity," id., indicating that there was no way to know of

SSI's intended use for the subsidized electricity at the point of bestowal.  Although Plaintiffs counter that SSI had in place separate meters calibrated by PEA which showed how much electricity was ultimately resold, see Pls.' Br. at 45, there is no indication that this information was available at the time of the bestowal of the subsidized electricity.  Commerce has indicated that the agency "will not trace the use of subsidies through a firm's books and records."  CVD Preamble, 63 Fed. Reg. at 65403.  This position is sound not only as a matter of administrative economy, but also because it recognizes that "a subsidy may provide benefits . . . not specifically named in a government program," id., including, for example, improved business relations with other companies.

The Court thus finds that Commerce did not err in determining that RTG provided SSI with an untied subsidy.  Based on this finding, Commerce correctly determined that the full amount of subsidized electricity provided by RTG to SSI should be used in the calculation of the ad valorem subsidy rate for the subject imports.  See 19 C.F.R. § 351.525(b)(3) (2006) (requiring Commerce to attribute untied domestic subsidies "to all products sold by a firm, including products that are exported").

Accordingly, the Court upholds Commerce's determination that RTG's provision of electricity conferred a countervailable

benefit to SSI in the amount calculated in the Final

Determination as supported by substantial evidence and in

accordance with law.

**C.    With Regard to Defendant-Intervenor's Claim, Commerce's Calculation of the Countervailable Benefit Received by SSI As a Result of Import Duty Exemptions Is Not Supported by Substantial Evidence or in Accordance with Law**

As noted in Royal Thai I, SSI enjoyed import duty

exemptions on steel slab which steeply reduced its import

tariffs.  See Royal Thai I, 28 CIT at ___, 341 F. Supp. 2d at

1326.  Commerce found that these exemptions constituted

countervailable subsidies.[12]  Id.  To calculate the resulting

countervailable benefit received by SSI, Commerce preliminarily

used as a benchmark (or point of comparison) the ten percent

ceiling tariff applicable to steel slab imports in Thailand,

presuming that the ten percent rate was the tariff SSI would

have paid but for the exemptions.  See Decision Memo at 25.

However, in the Final Determination, Commerce altered its

benefit calculation by using a different tariff rate benchmark

identified at verification.  Id.  At verification, Commerce

determined that RTG had established a tariff schedule structured

---

[12] Royal Thai I addressed the import duty exemptions received by SSI pursuant to Section 36(1) of Thailand's Investment Promotion Act of 1977 (**"IPA"**); however, the Final Determination also identified IPA Section 30 as the source of other countervailable import duty exemptions received by SSI.  See Decision Memo at 7. The description of Commerce's benefit calculations in this Part, as well as the Court's analysis and remand instructions related thereto, apply equally to both IPA Sections.

to comply with Thailand's obligations under the World Trade
Organization and the General Agreement on Tariffs and Trade.
App. to Pls.' Br., App. 5 (RTG Verification Report dated Aug.
17, 2001) at 3-4.  Under this structure, RTG created a ceiling
tariff of ten percent on imports such as steel slab.  Id.  RTG
also created a discount tariff rate of one percent usually
applied to any imported products and materials which were not
also produced domestically.  Id. at 4.  Commerce further
determined that, during the period of investigation, the steel
slab imported by SSI was not domestically produced in Thailand.
See Decision Memo at 5.  Applying its newfound understanding of
Thailand's tariff schedule, Commerce determined that, but for
the duty exemptions, SSI would have paid an import duty of one
percent on its imports of non-domestically produced steel slab.
Id. at 7.  Therefore, in the Final Determination, Commerce used
the one percent tariff rate as a benchmark for its calculation
of the countervailable benefit received by SSI as a result of
the import duty exemptions.  Id. at 25.

     U.S. Steel objects to this calculation.  U.S. Steel's
Memorandum in Support of Motion for Judgment on the Agency
Record at 43-44.  U.S. Steel argues that, in calculating the
benefit, Commerce used a tariff rate benchmark that itself was a
countervailable subsidy, rendering the calculation not in
accordance with law.  Id.  Specifically, U.S. Steel contends

that Commerce's determination that the one percent tariff rate

was non-specific and therefore not a countervailable subsidy is

unsupported by substantial evidence.  Id.  In U.S. Steel's view,

Commerce must instead recalculate the benefit from SSI's import

duty exemptions using the ten percent ceiling tariff rate.  Id.

The Court first notes that the purpose of benefit analysis

under U.S. countervailing duty law is to determine the actual

market value of a financial contribution provided to a company

by a foreign government subsidy.  See 19 U.S.C. § 1677(5)(E)

(1999).  After all, placing a duty on such a company's imports

in an amount equal to the countervailable benefit received is

intended to counteract any unfair advantage gained by government

intervention.  See Kajaria Iron Castings Pvt. Ltd. v. United

States, 156 F.3d 1163, 1166 (Fed. Cir. 1998).  It follows

logically that, when measuring the benefit derived from

countervailable government intervention, it is inappropriate to

use a benchmark that is similarly the product of government

intervention.  This commonsense principle is reflected in

Commerce's regulations[13] and judicial precedent.[14]

---

[13] See 19 C.F.R. § 351.503(d) (2006) (assessing benefit conferred
by government program offering varying levels of financial
contributions by using as benchmarks "financial contributions
provided at a non-specific level under the program").

[14] See, e.g., Hynix Semiconductor Inc. v. United States, 30 CIT
___, ___, 425 F. Supp. 2d 1287, 1308 (2006) (holding that
Commerce reasonably rejected as benchmarks private loans with

However, analyzing the benefit received from import duty

exemptions presents unique difficulties.  A tariff regime is an

inherently governmental construct.  In determining the

appropriate tariff rate to use in benefit analysis, there is no

prevailing market rate available for comparison, only another

government-set rate that would be paid absent the

countervailable exemption.  RTG and SSI appear to argue that

Commerce's only obligation is to determine the rate that would

be applied but for the exemption, regardless of whether or not

this rate itself constitutes a countervailable subsidy.

Plaintiffs' Memorandum In Opposition to U.S. Steel's Motion for

Judgment on the Agency Record (**"Pls.' Resp. Br."**) at 38, 41.  In

the Court's view, however, concluding the inquiry at this early

stage has the potential to subvert the very purpose of U.S.

countervailing duty law: to counteract the unfair effects of

foreign government subsidies.  That is, if Commerce's analysis

stopped at the point suggested by RTG and SSI, a loophole would

be created through which a foreign government could manipulate

---

terms affected by government involvement with borrower);
Allegheny Ludlum Corp. v. United States, 29 CIT ___, ___, 358 F.
Supp. 2d 1334, 1338 (2005) (noting that presumption of subsidy
extinguishment which accompanies sale of government-owned
company for fair market value may be rebutted upon showing of
distortive government intervention in broader market); AL Tech
Specialty Steel Corp. v. United States, 28 CIT ___, Slip Op. 04-
114 at 26-27 (Sept. 8, 2004) (noting that, if proven, government
manipulation would render a real estate appraisal an unreliable
measure of market conditions).

its tariff regime, layering one countervailable tariff rate upon
another, and thereby subsidize its domestic industries without
concern for retribution.

To prevent such unfairness, Commerce must make certain that
any tariff rate used to calculate the benefit received from a
countervailable tariff exemption is not itself countervailable.
In most cases, this inquiry is summary; however, where, as here,
at least two alternative tariff rates appear reasonably
available, a quick look does not suffice.  Instead, Commerce
must affirmatively establish the non-countervailability of the
tariff rate selected for use as a benchmark in benefit analysis.
As a practical matter (and as Commerce apparently chose to do
here[15]), this is likely to be accomplished through specificity
analysis.  See Royal Thai I, 28 CIT at ___, 341 F. Supp. 2d at
1317-20 (first applying specificity analysis to determine non-
countervailability).  This is because the specificity test
"function[s] as an initial screening mechanism to winnow out
only those foreign subsidies which truly are broadly available

---

[15] See Decision Memo at 7 (the one percent duty "policy appears
to be uniformly applied"); id. at 25 ("Many products have had
their duty rate lowered to one percent, not just slab."); see
also Defendant's Memorandum in Opposition to U.S. Steel's Motion
for Judgment upon the Administrative Record at 43 ("Commerce
made clear findings that the one percent rate was 'generally
applied' and therefore that it was not specific.").

and widely used throughout an economy."  SAA, H.R. Doc. No. 103-

465 at 929, 1994 U.S.C.C.A.N. at 4242.[16]

     Specificity analysis (which is non-regional in nature) has

two aspects.  To be non-countervailable, a subsidy must be both

non-specific as a matter of law (de jure) and as a matter of

fact (de facto).  Id. at 929-30, 1994 U.S.C.C.A.N. at 4242-43;

19 U.S.C. § 1677(5A)(D) (1999).  A subsidy is non-specific as a

matter of law if: (1) eligibility is automatic; (2) the

conditions for eligibility are strictly followed; (3) the

conditions are clearly set forth in a relevant statute or

regulation so as to be capable of verification; and (4) the

authority providing the subsidy does not expressly limit access

to the subsidy to an enterprise or industry.  19 U.S.C. §

1677(5A)(D)(i)-(ii) (1999); see also AL Tech Specialty Steel

Corp. v. United States, 29 CIT ___, ___, 366 F. Supp. 2d 1236,

1238 n.3 (2005).  A subsidy is non-specific as a matter of fact

if: (1) the actual recipients of the subsidy, whether considered

---

[16] However, as discussed supra in Part III.B, there are multiple
statutory criteria for establishing the existence of a
countervailable subsidy.  The absence of any one of these
criteria is sufficient to prove non-countervailability and
Commerce may freely select from among them in conducting its
analysis of potential tariff rate benchmarks.  Because the
Court's discussion herein is necessarily limited to specificity
analysis (i.e., the apparent basis for agency decision-making),
the Court expresses no opinion on whether the other statutory
criteria for establishing the existence of a countervailable
subsidy (including the presence of a financial contribution)
have otherwise been met in this case.

on an enterprise or industry basis, are not limited in number;
(2) no one enterprise or industry is a predominant user of the
subsidy; (3) no one enterprise or industry receives a
disproportionately large amount of the subsidy; or (4) the
authority granting the subsidy has not exercised its discretion
in a manner indicating that a particular enterprise or industry
is favored over others.  19 U.S.C. § 1677(5A)(D)(iii) (1999);
see also AK Steel Corp. v. United States, 192 F.3d 1367, 1384
(Fed. Cir. 1999).  Commerce's regulations require a sequential
analysis of these factors.  See 19 C.F.R. § 351.502(a) (2006).

Applying these principles to this case, Commerce must
demonstrate that the one percent tariff rate used to calculate
the benefit received by SSI under the duty exemption program is
both de jure and de facto non-specific.  Turning first to de
jure specificity, the Court finds that Commerce reasonably
selected the one percent tariff rate.[17]  Commerce, upon
discovering the two alternative rates, inquired about the nature
of the one percent rate.  App. to Pls.' Resp. Br., App. 9 (RTG
Verification Report dated Aug. 17, 2001) at 3-4.  In response to
Commerce's questionnaires, RTG provided the Thai tariff schedule
as well as a government publication explaining the tariff

---

[17] Although not specifically discussed in the Final
Determination, the Court concludes that Commerce relied on
record evidence, particularly the RTG Verification Report and
exhibits related thereto, as demonstrating the absence of de
jure specificity.  Accord AK Steel, 192 F.3d at 1384.

structure and its implementation (the **"Guide to Thai Taxation"**).

Id., App. 25 (RTG Verification Report dated Aug. 17, 2001) at

MOF Ex. 1, 3.  The tariff schedule showed a normal rate of ten

percent and a reduced rate of one percent.  Id. at MOF Ex. 1.

The Guide to Thai Taxation explained that the reduced duty rate

was applied to all imports which were not also produced

domestically.  Id. at MOF Ex. 3.  Based on this verified

information, it was clear that the eligibility criteria for the

reduced duty rate were set out in a government record (i.e., the

Guide to Thai Taxation).  Decision Memo at 25.  Further, based

upon RTG's stated procedure for determining the tariff rate, it

was also clear that the eligibility criteria were strictly

followed and that eligibility was automatic when those criteria

were met.  Id.; App. to Pls.' Resp. Br., App. 9 (RTG

Verification Report dated Aug. 17, 2001) at 4, MOF Ex. 6 (noting

that slab was eligible for one percent tariff rate solely

because it satisfied criteria, while other products were denied

rate because they did not).  In addition, record evidence showed

that the reduction itself was not expressly limited to any

particular industry or enterprise because RTG's policy was to

apply the rate to all industries.  Decision Memo at 25; App. to

Pls.' Resp. Br. dated Nov. 6, 2002, App. 9 (RTG Verification

Report dated Aug. 17, 2001) at MOF Ex. 1.  U.S. Steel does not

point to any evidence to the contrary and the Court is aware of

no record evidence otherwise suggesting de jure specificity.  As

such, the record evidence substantially supports the finding

that the one percent tariff rate was not de jure specific.

Accord Geneva Steel v. United States, 20 CIT 7, 47-48, 914 F.

Supp. 563, 598 (1996) (sustaining negative finding of de jure

specificity based on similar evidence).

     However, turning to de facto specificity, the Court is

unable to similarly sustain Commerce's selection of the one

percent tariff rate.  Commerce maintains that, because the one

percent tariff rate was applied to several different industries

and companies, the one percent tariff rate must be non-specific

as a matter of fact.  See Decision Memo at 7.  However, Commerce

did not inquire as to the quantity of imports made by each of

the industries/companies benefiting from the reduced tariff

rate.  As noted supra, the de facto prong of specificity

analysis requires Commerce to determine the actual use of the

tariff rate by sequentially analyzing the four applicable

statutory criteria.  A hypothetical example from this case

demonstrates why de facto specificity analysis must look to

actual use: while the one percent tariff rate was generally

available, it may be that the Thai steel industry was the only

industry actually importing significant amounts of goods at this

reduced rate during the period of investigation.  If so, then

the trade distorting effects would be exactly the same as if RTG

were reducing the tariff rate for only the Thai steel industry or SSI specifically.[18]

In the Final Determination, Commerce failed to make any findings with respect to imports at the one percent tariff rate made by industries or companies other than the Thai steel industry. This constituted clear error by Commerce. See Roses, Inc. v. United States, 14 CIT 444, 454-55, 743 F. Supp. 870, 879 (1990) (finding flawed application of de facto specificity analysis sufficient basis for remand when error not otherwise harmless). The Court therefore remands this issue for Commerce to conduct a more thorough de facto specificity analysis. On remand, Commerce must demonstrate, if it is able, that the one percent tariff rate was non-specific as a matter of fact – i.e., Commerce must address each of the four statutory criteria enumerated in 19 U.S.C. § 1677(5A)(D)(iii). There are no rigid rules for determining whether a subsidy satisfies these criteria. See SAA, H.R. Doc. No. 103-465 at 930, 1994 U.S.C.C.A.N. at 4242 (characterizing specificity analysis as a

---

[18] Further, to end de facto specificity analysis with mere appearances would again serve to create a loophole through which foreign governments could easily subsidize selected industries or companies. A foreign government would only need to make available an ostensibly universal subsidy which is in actuality used by a single favored industry or company. See Cabot Corp. v. United States, 9 CIT 489, 495, 620 F. Supp. 722, 730 (1985) (observing that U.S. countervailing duty law is not "concerned with the nominal availability of a governmental program" but with "what aid or advantage has actually been received").

"rule of reason"). However, Commerce must point to substantial record evidence supporting a finding of non-specificity with respect to each statutory criterion.[19] See 19 U.S.C. § 1516a(b)(1)(B)(i) (1999). If Commerce is unable to do so, then Commerce must either: (1) establish the non-countervailability of the one percent tariff rate benchmark through alternative analysis, see supra note 16, or (2) revise the Final Determination by appropriately identifying and using a different, non-countervailable benchmark for measuring the countervailable benefit received by SSI as a result of import duty exemptions.

## IV.  CONCLUSION

For the foregoing reasons, the Court remands the Final Determination. A separate order will be entered accordingly.


/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge


Date:    July 26, 2006
         New York, New York

---

[19] If necessary, Commerce may reopen the administrative record in order to obtain information inadvertently overlooked as a result of applying an erroneous specificity analysis.